1

1        IN THE UNITED STATES DISTRICT COURT

2         IN AND FOR THE STATE OF CALIFORNIA

3               -oOo-



4  LUPI EDWARDS, individually and)
    as decedent FIAILOA SAUPO   )
5  EDWARDS' successor-in-interest)
    and RUBY SERA AUNEI, a minor, )
6  by LUPI EDWARDS, her guardian )
    ad litem,               )
7                     )
       Plaintiffs,       )
8                     )
       vs.               )Case No.: CV12-10994-PA(AGRx)
9                     )
    FORD MOTOR COMPANY, INC.,   )
10  and DOES 1 through 200,    )
    inclusively,           )
11                    )
       Defendants.       )
12  _____)

13

14        DEPOSITION OF MICHAEL CHAMBLISS, M.D.

15               Taken at

16       Fresno County Coroner's Office
       3333 East American Avenue, Bldg 702
17          Fresno, California

18     Tuesday, August 27, 2013 at 1:00 p.m.

19

20             REPORTED BY:

21  JENNIFER W. HARMON, CSR *** CERTIFICATE NO. 11770

22

23

24

25

2

1                          I N D E X

2

3    EXAMINATION                                    PAGE

4    BY MR. MURPHY                                  4, 83

5    BY MR. BARONE                                  79, 86

6

7

8

9

10                        E X H I B I T S

11   EXHIBIT NO.                                    PAGE

12   7          Notice of Deposition               14

13   8          Curriculum Vitae                    14

14   9          Documents produced at deposition    14

15   10         Autopsy photographs                 21

16   11         Photos taken at the scene           21

17   12         Handwritten notes                   34

18   13         Death Certificate                   81

19

20

21

22

23

24

25

3

1   APPEARANCES OF COUNSEL:

2   For the Plaintiffs:

3        ROSE, KLEIN & MARIAS LLP

4        BY:  RICHARD G. BARONE, ESQ.

5        801 South Grand Avenue, 11th Floor

6        Los Angeles, California 90017

7        (213) 626-0571

8        r.barone@rkmlaw.net

9
    For the Defendant FORD MOTOR COMPANY:
10
         SNELL & WILMER LLP
11
         BY: JONATHAN R. MURPHY, ESQ.
12
         600 Anton Boulevard, Suite 1400
13
         Costa Mesa, California 92626
14
         (714) 427-7000
15
         jrmurphy@swlaw.com
16

17

18

19

20

21

22

23

24

25

Michael Chambliss, M.D.                          4

1    The following proceedings occurred at the hour of 1:40

2    p.m. and testimony taken, to wit:

3                        -oOo-

4    MICHAEL CHAMBLISS, M.D.,

5                Being first duly sworn by the

6                Certified Shorthand Reporter,

7                testified as follows:

8                        -oOo-

9                     EXAMINATION

10   BY MR. MURPHY:

11        Q.    First of all, my name is Jonathan Murphy.  I

12   represent Ford Motor Company in this action that was filed

13   against the family of Fiailoa Edwards.  Will you please

14   state your full name for the record?

15        A.    My name is Michael Chambliss, and Chambliss is

16   spelled C-h-a-m-b-l-i-s-s.

17        Q.    I assume you've been deposed before?

18        A.    Yes, I have.

19        Q.    Of course, you understand that though we're in an

20   informal setting, the testimony you'll be giving is the same

21   as if you were testifying in a court of law and the same

22   penalties apply, of course?

23        A.    Yes, I do.

24        Q.    If you have any questions about anything, please

25   let me know.  I'll try to go as quickly as we can here.

Ford's Objections:
Incomplete-
Testimony should
begin at 4:13 with
"Will you please
state "Will you
please state your
full name for the
record".

Michael Chambliss, M.D.                                    5

1    Where are you currently employed?

2          A.    I'm employed at the Fresno County Coroner's

3    Office.

4          Q.    What's the address where you can be reached

5    there?

6          A.    The address is 3333 East American Avenue, Building

7    702 is our business address, Fresno, California.

8          Q.    What's your title position?

9          A.    Coroner's pathologist.

10         Q.    What are your responsibilities in that position?

11         A.    My responsibilities are to perform autopsies to

12   determine cause of death and manner of death.

13         Q.    Are you the official who actually makes the formal

14   determination for the county?

15         A.    No, I come up with the autopsy findings.  With the

16   findings, I come up with what would be considered the cause

17   of death.  Those items are then presented to the coroner who

18   then finalizes all the information on the case and signs it.

19   The coroner is Dr. Hadden for Fresno County.

20         Q.    Is he an elected official?

21         A.    Yes, he is.

22         Q.    Does he usually rely on your opinion based on the

23   examinations you've done?

24         A.    Yes, he does.

25         Q.    How long have you been in the position of the

Michael Chambliss, M.D.                                    **6**

1    coroner's pathologist?

2           A.      Here in Fresno since June 2003.

3           Q.      Do you have any plans to change jobs?

4           A.      Not in any time in the future.   The possibility is

5    in the next few years retiring at some point, but not

6    presently.

7           Q.      Can you describe any prior employment you had in

8    the medical field?

9           A.      My prior employment was with the Cook County

10   Medical Examiner's Office in Chicago, which includes Chicago

11   and the surrounding suburbs.   I did my training there from

12   1984 through 1985, and I followed up my training there from

13   1985 through 1991 as a deputy medical examiner.   So that

14   would have been my first job out after training.   Following

15   that, I came to Fresno County for the first time in 1991 and

16   joined a group, Community Pathology Associates, in which I

17   worked here in Fresno doing primarily forensic pathology,

18   but I also did some hospital pathology work with the group

19   and stayed here for approximately two years or so.

20              Following that, I returned to the Midwest, to

21   Wisconsin specifically, Waukesha, Wisconsin, which is a

22   suburb outside of Milwaukee where I became the medical

23   examiner for Waukesha County.   It's a smaller county which

24   you have one medical examiner and deputy medical examiners

25   are investigators in that particular facility.   I worked

Michael Chambliss, M.D.                                    **7**

1   there for a number of years.  I believe it was four or five
2   years.  Following that, I became an independent contractor
3   for multiple counties in northeast Wisconsin, the coroner's
4   systems there.  I became their coroner pathologist and would
5   do cases for about five different coroner systems in
6   northeast Wisconsin prior to coming out here in June 2003 to
7   join Fresno County as a coroner's pathologist.
8        Q.    What type of training do you have in forensic
9   pathology?
10       A.    My training was at the Cook County Medical
11  Examiner's office in Chicago for one year, from 1984 through
12  1985.
13       Q.    Would you please give me a brief description of
14  your educational background?
15       A.    My educational background, I completed my
16  undergraduate at Western Illinois University and upon
17  completing my BS there, attended medical school at Southern
18  Illinois University School of Medicine and completed my
19  training there in medical school.  After completing medical
20  school training, I entered a pathology training program in
21  both anatomical and clinical pathology there in Chicago at
22  Michael Reis Hospital and Medical Center taking two years of
23  anatomical pathology and two years of clinical pathology.
24  That lead up to about 1983 or so.  In 1983, I did a
25  subspecialty year in medical microbiology at Northwestern

Michael Chambliss, M.D.                                    8

1    Memorial Hospital from 1983 to 1984.  Then in 1984 I entered

2    a forensic pathology training program at Cook County Medical

3    Examiner's Office.

4         Q.    Are you board certified in pathology?

5         A.    I'm board certified in anatomical pathology,

6    clinical pathology and forensic pathology.

7         Q.    Do you have any certification in neuropathology?

8         A.    No, I do not.

9         Q.    Do you have any training in neuropathology?

10        A.    Just through the field of forensics, but nothing

11   specifically specializing in neuropathology.

12        Q.    You have some experience through your practice of

13   pathology through the course of your career?

14        A.    Yes, that's correct.

15        Q.    What training do you have in that?

16        A.    Primarily what we would do is not only perform the

17   autopsies, but we would have consultations with the forensic

18   neuropathologist and then the neuropathologist would review

19   the particular cases and examine the brain on certain cases

20   and from the information provided by the consultant, that's

21   where knowledge base would come from.  I've worked with at

22   least two specific forensic neuropathologists while I was at

23   the Cook County Medical Examiner's Office, one of which

24   actually utilized the information from our office to make

25   the primary textbook on forensic neuropathology.

Michael Chambliss, M.D.                                    9

1      Q.    When does the county call in a neuropathologist to
2  consult?
3      A.    A county would do that or the forensic
4  neuropathology would do that in a case where there may be
5  questions about separating out either natural possibilities
6  for the particular findings we see in the brain versus an
7  accidental cause for what we're finding in the brain versus
8  a homicidal type of situation.  It comes to a point where
9  you'd like to separate out which type of findings are
10 present and you present that to a consultant and get his
11 opinions about it.
12     Q.    How many forensic exams have you performed in your
13 career?
14     A.    I would say over 5,000 autopsies would be the
15 number.
16     Q.    What percentage of those involve people involved
17 in an automobile accident?
18     A.    That would be difficult to say.  I would say it's
19 probably the fourth most common type of death that we would
20 see.  We would see natural deaths.  We would see -- it's
21 within the top four type of causes of death that we would
22 see, probably even higher than that.
23     Q.    If you're able to estimate a percentage -- are you
24 able to estimate any percentage or number of those that
25 you've been involved in that involve automobile accidents?

Michael Chambliss, M.D.                                          **10**

1        A.    I've never been asked that question before.  I

2    would say close to 1,000, I would say close to that in my

3    career, 29 years I'd say.  Close to 1,000 of them.

4        Q.    You would consider yourself to be experienced in

5    examining the bodies of the people killed in automobile

6    accidents?

7        A.    Yes, I would.

8        Q.    Did any of the accidents -- did any of the bodies

9    which you examined involved in automobile accidents involve

10   automobile rollover accidents?

11       A.    Yes, I have examined cases such as that.

12       Q.    Would you say it would be a significant amount?

13       A.    Well, rollover accidents, we find them pretty

14   significant here even in Fresno County.  I'd say since 2003

15   probably a third of the cases or more we could see rollover

16   accidents.  It's a pretty common type of phenomenon that

17   takes place.

18       Q.    More than 200 of the autopsies would have been

19   involving rollovers?

20       A.    Either myself or my partner, I would say.  We get

21   quite a few rollover accidents.

22       Q.    You've been involved in investigating a number of

23   those accidents?

24       A.    Yes.

25       Q.    Can you give any estimate of the number that

you've investigated yourself?
A. No, I couldn't. I would just only be guessing, and I wouldn't want to try to guess at that.
Q. Would you say it would be more than 100?
A. Oh, definitely more than 100.
Q. Have you ever given testimony in court concerning your forensic examinations of someone involved in a car accident?
A. Yes, I have.
Q. On how many occasions?
A. Oh, I would say less than 100, but it's not something that --
(Interruption at the door.)
THE WITNESS: I have done a number of cases in which I've testified in court on motor vehicle accidents. Most of the time they're depositions on motor vehicle accidents, so I haven't testified in court as often. Most of the time they end up being less than 100 cases for sure.
BY MR. MURPHY:
Q. Those times that you've testified in court regarding your examination of someone who is involved in an automobile accident, have you been allowed to give expert opinions regarding the conclusions of your examination?
A. Yes.
Q. You've been allowed by the court to do that?

Michael Chambliss, M.D.                                    **12**

1    A.    Yes, I have.

2    Q.    On how many occasions has that been the case?

3    A.    I would say -- again, on those occasions which I
4    actually go to court, and all of those particular occasions
5    I've been able to give my opinions and all my findings and
6    my opinions as a result of what I found in the autopsies.

7    Q.    How many times would you estimate you've done
8    that?  Would those be all the cases you've gone to court?

9    A.    Absolutely.  All the cases I've gone to court I've
10   been allowed to render expert opinions on my findings.
11   Generally, they've been in cases that have involved the
12   District Attorney's office and some cases they've been
13   private attorneys that have asked me to come testify.

14   Q.    Were any of those civil matters?

15   A.    Yes, there have been civil matters in which I've
16   testified in.

17   Q.    Do you know how many of those you've testified
18   in?

19   A.    Those would be the smallest number of cases I
20   would testify in.  It's generally for the District
21   Attorney's office in which there's either a DUI situation or
22   some other charges brought against someone involved the
23   accident itself.

24   Q.    Any estimate as to how many civil cases you've
25   testified in?

Michael Chambliss, M.D.                    13

1       A.    No, it's been a while since I've testified in a

2  civil case and I just don't keep track of that anymore,

3  because most of the time it's with the county and doing

4  cases for a district attorney.

5       Q.    Would there be anywhere you would be able to go

6  back and determine what cases you've testified in civil

7  cases before?

8       A.    It would be difficult, because -- I used to keep

9  ledgers of every case that I did.  I had multiple ledgers.

10 I don't go through them and say -- I'd have to read each

11 particular case and know which one is civil and which one is

12 criminal.

13      Q.    Do you have a ledger of case that you've testified

14 in somewhere?

15      A.    No.

16      Q.    It's not current?

17      A.    No.

18      Q.    What about one that's not current?

19      A.    I don't have anything that specifically tells me

20 you've testified in this case, you've testified in that

21 case.  I don't have anything that specifically states

22 that.

23           MR. MURPHY:  Let me go ahead and I'll attach as

24 Exhibit 7 a notice of your deposition.  This asks you to

25 bring with you some documents.

Michael Chambliss, M.D.                                          14

1                    (Whereupon, Exhibit 7 was

2                    marked for identification.)

3    BY MR. MURPHY:

4        Q.    I'll give you a chance to look at that and the

5    documents it requests you bring.  Have you seen that

6    document before?

7        A.    Yes.

8        Q.    It asks you to bring documents like I discussed,

9    correct?

10       A.    Yes.

11       Q.    Have you brought those documents with you today?

12       A.    Yes, I have.

13       Q.    You also brought a copy of your curriculum vitae;

14   is that correct?

15       A.    That's correct.

16             MR. MURPHY:  I'll attach that as Exhibit 8 and

17   I'll attach the documents which you brought with you in

18   response to that subpoena as Exhibit 9.

19             (Whereupon, Exhibit 8 and Exhibit 9 were

20                    marked for identification.)

21   BY MR. MURPHY:

22       Q.    Are those all the documents you brought with you

23   today, Exhibit 9?

24       A.    Yes, they're copies of all the items that are

25   present in our case file from the coroner's office.

Michael Chambliss, M.D.                           15

1    Q.    There are additionally some photographs that are
2  in that file, are there not?
3    A.    The photographs are kept as part of the
4  computerized portion of the file and any time there's a
5  request for that, a CD is made and given out at that
6  particular point in time.  They're not kept as part of the
7  paper file.  They're kept as part of the computer file on
8  the case.
9    Q.    Is anything else kept on the computer other than
10 the photographs?
11   A.    No.  Well, let me correct that.  What it is is you
12 have a documentation of the first call information that
13 comes in.  It's everything that would be considered the
14 initial paperwork portion of the product that becomes the
15 file.  That's how we go back and locate the case and find
16 out the initial call, who called in and it's generally put
17 directly into the computer system.
18   Q.    Is there any way to obtain that information?
19   A.    I don't know how to do it other than through the
20 IT department for the county.  I don't know how they would
21 be able to do it in response to a request from an
22 attorney.
23   Q.    Is all the information that's contained within
24 these files kept on the computer also contained within the
25 documents you brought with you today?

Michael Chambliss, M.D.                              16

1       A.   Yes, they are.

2       Q.   We'll return to what you brought with you in a

3  second.  First, I'd like to go over your CV.  You've been

4  over most of it already.  Is Exhibit 8 a copy of the

5  curriculum vitae you brought with you today?

6       A.   Yes, it is.

7       Q.   This information within your curriculum vitae,

8  when was the last time it was updated?

9       A.   Actually, I went through it and updated it through

10  today.

11      Q.   It's updated through today then?

12      A.   Yes, it is.

13      Q.   This document states that you've investigated and

14  certified over 7,000 deaths as a deputy medical examiner,

15  coroner's pathologist and chief medical examiner; is that

16  correct?

17      A.   That's correct.

18      Q.   You've also performed over 5,000 autopsies; is

19  that correct?

20      A.   That's correct.

21      Q.   You've given testimony in both civil and criminal

22  matters in over 800 cases, correct?

23      A.   That's correct.

24      Q.   Do you have any training in biomechanics?

25      A.   No, I do not.

Michael Chambliss, M.D.                                        17

1        Q.    What about accident investigation?

2        A.    No, I do not.

3        Q.    Do you have any training in accident

4    reconstruction?

5        A.    No, I do not.

6        Q.    If you'll pass me what we've attached as Exhibit 9

7    there, these are paperclipped together.  We'll have to make

8    sure we keep them in that order in which we received them.

9            MR. BARONE:  Do you want to separate the documents

10   by A, B, C within that group?

11           MR. MURPHY:  Sure.  That way we don't get

12   confused.  I'm just marking these documents with letters

13   according to how they've been organized.

14           MR. BARONE:  Off the record.

15               (Discussion held off the record.)

16           MR. MURPHY:  Back on.

17   BY MR. MURPHY:

18       Q.    You've given us a copy of a file that you have in

19   front of you which is the entire coroner's file for the

20   investigation of the death of Fiailoa Edwards; is that

21   correct?

22       A.    That's correct.

23       Q.    Let's start with the first two pages of what

24   you've given us here.  I'm referring to Exhibit 9-A.

25   There's a cover page here and a case number and the name of

Michael Chambliss, M.D.                    18

1   the case and then the second page is the certificate and

2   verdict.  Can you explain what the purpose of this second

3   page is?

4        A.   The second page is actually the opinion rendered

5   by the coroner, Dr. Hadden, after reviewing the autopsy

6   report that I put together plus the toxicology report that's

7   generated by an outside toxicology lab plus the information

8   gathered by our deputy coroner in the coroner's office.

9   After reviewing all of that, he issues a coroner's

10  certificate and verdict on the case and that's what Page 2

11  is.

12       Q.   Looking through what's attached as 9-A here, we

13  have -- can you refer to the pages that you prepared

14  yourself?

15       A.   Under 9-A pages would be the third page, fourth,

16  fifth, sixth, seventh and eighth pages of the document which

17  would be headed as the -- the topic would be autopsy

18  report -- Fresno County Coroner's Autopsy Report were

19  prepared after I dictated the case following my autopsy.

20  That's all produced by my findings.

21       Q.   You produced Pages 3 through 8 of Exhibit 9-A?

22       A.   Yes, I did.

23       Q.   You mentioned that there -- is this a

24  transcription of your report or is this something that you

25  typed up?

Michael Chambliss, M.D.                                    **19**

1      A.    No, it's a transcription.  What we do after

2   completing the autopsy, we'll dictate the case into a

3   telephonic setup that is -- we have a contract with a

4   dictation service that will produce that for us, return it

5   to us on the computer, we can make corrections on the

6   computer.  Once we've done that, we can then sign the case

7   as being completed.  We then turn it over to our deputy

8   coroner, so that they may go about finishing their portion.

9   If they've already done it, we put both items together with

10  the toxicology and then present it to the coroner for his

11  signature.

12      Q.    Had you reviewed this file prior to coming here

13  today for your deposition?

14      A.    Yes, I have.

15      Q.    When was the last time you reviewed it prior to

16  coming here today for your deposition today?

17      A.    I think about a week ago is the last time I

18  reviewed it.  Since that time I've been on autopsy service,

19  about a week ago.

20      Q.    Prior to reviewing the report in the file from the

21  coroner's office, did you have any recollection of

22  conducting this examination?

23      A.    Not an independent recollection of this at all,

24  no.

25      Q.    You also had an opportunity to review some

Michael Chambliss, M.D.                                    **20**

1   photographs before we started here today, correct?

2        A.    Yes, I did.

3        Q.    Were those photographs the photographs that we

4   referred to earlier which were taken in connection with the

5   investigation of this death?

6        A.    Yes.

7        Q.    Did those photographs refresh your recollection at

8   all of this examination?

9        A.    Yes.

10            MR. BARONE:  Did the report refresh your

11   recollection?

12            THE WITNESS:  Yes.  To the extent of -- what I

13   generally do once I get the report, I look at the

14   photographs at the same time, so I'm doing those in

15   conjunction, so that enlightens me a little more on what the

16   findings are in the case.  The report utilized at the same

17   time I was reviewing the photographs.

18   BY MR. MURPHY:

19        Q.    You reviewed the photographs prior to coming here

20   for your deposition today; is that correct?

21        A.    Yes, I did.

22        Q.    Was that at the same time you reviewed the report?

23        A.    Yes, it was.

24            MR. MURPHY:  Let me show you a set of photographs

25   which we'll mark as Exhibit 10.

Michael Chambliss, M.D.                                21

1                    (Whereupon, Exhibit 10 was

2                    marked for identification.)

3    BY MR. MURPHY:

4         Q.    Are those the photographs which you reviewed?

5         A.    Yes, they are.

6               MR. BARONE:  Were those produced by Dr. Chambliss

7    today or did you have those?

8               MR. MURPHY:  They were produced last week.

9               MR. BARONE:  I never got a copy.

10              MR. MURPHY:  We subpoenaed them.  We will send

11   them over to you.  I think they were faxed to us.

12              THE WITNESS:  I believe they were at the time.

13              MR. MURPHY:  I'll show you another.

14              MR. BARONE:  I have those unless they were taken

15   --

16              THE WITNESS:  Those would have been the initial

17   ones taken at the scene and the ones in your hand are from

18   the autopsy.

19   BY MR. MURPHY:

20        Q.    Exhibit 10 is the autopsy photographs, correct?

21        A.    That's correct.

22              MR. MURPHY:  Let me show you another set of

23   photographs.  We'll mark these Exhibit 11.

24                   (Whereupon, Exhibit 11 was

25                    marked for identification.)

Michael Chambliss, M.D.                    22

1   BY MR. MURPHY:

2       Q.   Were those also some of the photographs that were

3   taken in connection with the coroner's investigation of this

4   death?

5       A.   Yes, they were.

6       Q.   Did they appear to be photographs taken at the

7   scene of the accident?

8       A.   Yes, they are.

9            MR. BARONE:  Were those taken by Sarah Davis.

10           THE WITNESS:  They would have been taken by Sarah

11  Davis, the deputy coroner assigned to the case.

12  BY MR. MURPHY:

13      Q.   Have you had a chance to look at all of these

14  photographs in Exhibits 10 and 11?

15      A.   Yes, I have.

16      Q.   Do those appear to represent all the photographs

17  that were taken by the coroner in the investigation of this

18  death?

19      A.   Yes, they do appear to be.

20      Q.   Who actually took the photographs in Exhibits 10

21  and 11?

22      A.   Exhibit 11 the photographs were taken by Sarah

23  Davis.  Exhibit 10, the photographs were -- I took the

24  photographs and some of the photographs themselves in 10 you

25  can see a blue-gloved hand in there, which is my hand

Michael Chambliss, M.D.                                    23

1    holding the gray card.  So I would have taken those

2    photographs at the time of the autopsy.  We take our own

3    photographs.

4         Q.    You took the photographs in Exhibit 10?

5         A.    Yes, I did.

6         Q.    Who else from the coroner's office participated in

7    this investigation?

8         A.    As far as -- I'm not sure who you're referring

9    to.

10        Q.    Has anyone else from the coroner's office

11   participated in the investigation of this death?

12        A.    Not from our office.  It would have been just

13   Sarah Davis and myself and I had an autopsy assistant who

14   worked with me with the case, but that would be the only

15   people involved with the case at all.

16        Q.    Did you receive -- what was Sarah Davis' role?

17        A.    Sarah Davis is the initial contact with

18   individuals who call the case to our office and so she would

19   gather the information about the case.  Once she gathered

20   the information about the case, she would have responded to

21   the scene in this particular type of case, since it's a

22   motor vehicle collision.  When she gets to the scene, she

23   would have spoken to officials from the California Highway

24   Patrol about the circumstances of the accident and gathered

25   information there.  She returns.  Before returning, she

Michael Chambliss, M.D.                    24

1  would contact our transport people who contract with our

2  office who are pictured in some of the photographs she's

3  taken.  Those are individuals who are transport people that

4  contract with our office.

5       Q.    These are individuals you're referring to in

6  Photograph 11-1?

7       A.    Yes, that's correct, in the white shirts present

8  there.  Those are two individuals who work for a removal

9  service that contracts with the coroner's office and comes

10 to the scene and takes cases back to the coroner's office.

11      Q.    Did you speak with Ms. Davis about her visit to

12 the scene of this accident?

13      A.    Yes.  The general format or how we do any case is

14 unless it's a homicide, in which I respond to the scene, the

15 following day we have a morning meeting in which we go

16 through all the cases in which that particular deputy

17 coroner or any deputy coroner has investigated.  It would

18 have been presented in front of myself, Dr. Hadden, if he's

19 present there, and Dr. Gopal if he's present there.  The

20 minimum would have been myself since I was working that day.

21 So she would have presented it to me.  We discussed the case

22 and I would have arranged for an autopsy.

23      Q.    Do you recall speaking with her about this case in

24 particular?

25      A.    Not independently, but I'm sure that's the format

Michael Chambliss, M.D.                                    25

1    in which we do it, and she would have had contact with me

2    after being at the scene.  So I'm absolutely sure we spoke

3    about the case.

4        Q.    Do you recall going to the scene of this

5    accident?

6        A.    No, I would not have gone to that scene or motor

7    vehicle accident scene.

8        Q.    Have you ever seen this vehicle -- strike that.

9              Have you ever seen the vehicle involved in this

10   case?

11       A.    No, I have not, other than just the photographs

12   that were present, not in person, if you will.

13       Q.    When would you have first learned about this

14   accident?

15       A.    Again, it would have been at the time when she

16   contacted me with the information about the case.  In

17   general, it's at our first morning meeting.

18       Q.    That would have been the first you've heard of

19   it?

20       A.    Yes.

21       Q.    Since we're discussing it, why don't you take us

22   through the normal protocol that your office goes through

23   investigating a death?

24       A.    The normal way that we investigate a death is the

25   initial people that get involved are deputy coroners.  Our

Michael Chambliss, M.D.                                    26

1    deputy coroners will take phone calls either from law

2    enforcement individuals, such as in a motor vehicle accident

3    or death at a home or death anywhere that's out unattended

4    or they will get calls from hospitals about deaths that take

5    place in the hospital, but they are our initial people that

6    take in the information and determine the disposition that

7    happens next.  After gathering enough information, there are

8    certain cases that we give them guidelines that they need to

9    respond to the scene, such as motor vehicle accidents,

10   deaths in houses in which there are no next of kin and

11   homicide cases are a few examples.  So once gathering the

12   information, they then go to those particular types of

13   cases, gather more information, take photographs to document

14   as much as they can about the circumstances and the scene so

15   that when they return to our office, they can present not

16   only the written information, but photographic information

17   on the case.  That's how it's initially done.  They are now

18   trained to write a complete report as far they can prior to

19   coming to our morning meeting.  But once we sit in our

20   morning meeting, we discuss the case and determine what the

21   next step would be and it's whether we do an autopsy or not.

22   That's how our initial steps in investigating the case take

23   place.

24        Q.    If an autopsy -- what determines whether or not an

25   autopsy is ordered?

Michael Chambliss, M.D.                                           27

1     A.    We have certain types of cases that are automatic

2  autopsies, such as baby deaths that take place, homicide

3  cases, most motor vehicle accidents in which multiple people

4  are involved that pass away in the accident or the

5  circumstances are such that discussing it we feel that it's

6  significant enough we'll do an autopsy.   It's on a

7  case-by-case basis, I'll put it that way.

8     Q.    Then in the instance of the case we're here

9  discussing today, do you know what prompted the autopsy to

10 be done?

11    A.    The circumstances that were indicating what took

12 place, the circumstances at the scene as far as the traffic

13 was -- from what I know presented to me -- a stopped

14 situation, another car coming up to a particular situation

15 out on I-5.   When we discuss it ourselves, meaning the

16 deputy coroner and the doctor and the other two doctors, we

17 utilize our experience and say these types of cases we

18 probably should do autopsies on, so it's a case-by-case

19 thing.

20    Q.    Nothing in particular that led you to do one in

21 this case?

22    A.    In these types of cases we look towards is there

23 something inherently wrong with the vehicle, is there

24 something that's involved with the individual driving the

25 car.   There are a number of questions that we look at from

Michael Chambliss, M.D.                    28

1    our experience on doing these cases that we think about from

2    the perspective of we need to know more information about

3    this individual driving the car, the car itself, anything

4    that would be significant as far as determining the cause of

5    death and a manner of death.  There could be a number of

6    different items.

7         Q.    Once an autopsy is ordered, what's the protocol

8    for conducting the autopsy?

9         A.    The protocol is pretty much the same -- we do the

10   same type of procedure on every autopsy.  It's a complete

11   autopsy.  It's done with documentation of photographs.  It

12   may or may not be done with the presence of law enforcement

13   there.  Some cases we do have law enforcement present with

14   their own photography people.  We take all toxicology

15   specimens that are available, particularly vitreous, the

16   fluid from the eye, blood for sure.  We may or may not have

17   urine available, but we at least have one or two specimens,

18   vitreous and blood.  We examine all the organs and document

19   all the finds as far as pathology as well as injuries.

20         At the completion of that, we come up with our

21   preliminary findings and cause of death and from that we try

22   to determine a manner of death.

23         Q.    When conducting an external examination, what's

24   the process that you follow?

25         A.    The external examination again depends on the type

Michael Chambliss, M.D.                                    29

1    of case.  It's done the same way except in homicide cases.

2    We'll document the findings of the individual's clothing,

3    height, weight, race, their age, any identifying features on

4    the individual, tattoos, anything else that would help us

5    say that this is the individual.  Also, during the external

6    exam, we will examine those clothes to see if there's

7    something significant that may help us as far as determining

8    specifics that are important in the case.  Then, we will

9    photograph everything on the body, clothed and unclothed.

10   That would essentially complete the external examination,

11   unless we're doing a homicide case we will probably do

12   x-rays and other findings such as collect evidence, but an

13   external is pretty much the same in every case.

14       Q.    Let me refer you now to the report that you've

15   prepared.  When was this autopsy conducted?

16       A.    On June 13, 2011.

17       Q.    That would have been the day after the accident

18   occurred, correct?

19       A.    That's correct.

20       Q.    Do you know why it was done at that time?

21       A.    Basically on the particular time in which the

22   accident occurred, we don't do autopsies in late afternoon.

23   We'll do them the next day, first of all.  And it depends

24   upon the number of cases we have to do on that particular

25   day, the 13th.  That would have determined the time frame

Michael Chambliss, M.D.                                    30

1    that was done.

2         Q.    Do you recall how many cases you had in front of

3    you that day?

4         A.    Not specifically, no.

5         Q.    Can you provide us with an overview of the exam

6    that you did of this decedent?

7         A.    Sure, initially we would have provided -- with all

8    the information provided by Sarah Davis, the deputy coroner,

9    I would have first of all checked the body completely for

10   clothing, documented all the clothing and any personal

11   effects which were present with Mr. Edwards including a

12   wallet with all of the personal papers and money present in

13   the wallet, and then proceeded to take off all the clothing

14   and photograph the body at that time.  Following that, I

15   would have gone through the process of documenting his

16   appearance, his weight, his height and going from top to

17   bottom describing the head, neck, chest, whole torso, arms,

18   legs, everything, front surface, photograph everything on

19   the front, same on the back, photograph everything on the

20   back including injuries and proceed from that point.

21        Q.    What would you do after that?

22        A.    After doing a documentation of all the external

23   findings including hospital treatment and the evidence of

24   injury that's noticed on the outside, we do an internal exam

25   which actually further elaborates on the evidence of injury

Michael Chambliss, M.D.                                              **31**

1  internally and anything else that would be of note in any

2  system in the body, such as the lungs, the heart, the liver,

3  the spleen, anything internally.  We document their weights.

4  We document any injuries to those particular organs.  And

5  following that, we examine the head and neck region for the

6  presence of injury and document all those findings.  Also,

7  during the internal exam, we would draw toxicology, such as

8  blood, urine and vitreous which were present in this

9  particular case.  We also took additional samples of blood

10  which we keep in our deep freezer for the utilization later

11  for possible DNA or something of that particular purpose.

12  After documenting all those items I come up with a

13  preliminary list of findings from the autopsy.

14       Q.   At some point you prepare a report documenting

15  your findings and evidence you base them on, correct?

16       A.   That's correct.

17       Q.   In this case, do you know when you prepared that

18  report?

19       A.   It would have been dictated sometime after this.

20  I don't have an indication specifically.  It was later.  It

21  was much later.  I can see here it's already listed as

22  almost three months later from the dictation and typing

23  service portion here.

24       Q.   That dictation would be based on your notes,

25  correct?

Michael Chambliss, M.D.                                    32

1       A.    That's correct.

2       Q.    Would you make notes during the course of your

3  examination?

4       A.    Yes, that's correct.

5       Q.    What format do you take notes in?

6       A.    Generally the format is that there are diagrams

7  that are prepared during the course of the autopsy itself or

8  even on a handheld dictation thing in which I will

9  transcribe some of the findings that I have on a dictation

10  machine and go from there.  It's extra work, but it's an

11  easier way for me to remember items to transfer them to a

12  note and then dictate them.

13      Q.    You'll use a variety of formats, including

14  dictation and notes you take by hand?

15      A.    Yes, both handwritten notes and -- either that or

16  sometimes I will use a dictation machine if I have multiple

17  cases on a day.

18      Q.    In general, do you have someone assisting you with

19  the examination?

20      A.    Yes, I do.  There's one autopsy assistant that

21  works with the doctor per day.  I'm not sure exactly which

22  autopsy assistant it was at this time, but we have one

23  working with us, every case.

24      Q.    You have one working with you in every case?

25      A.    Yes.

Michael Chambliss, M.D.                    33

1        Q.    There would have been one assisting you in this

2   case?

3        A.    Yes.

4        Q.    Does that person assist you in taking notes at

5   all?

6        A.    No, only time they would possibly assist me in

7   taking notes is if I'm weighing organs.  If I'm weighing

8   them, they would write down the organ weight to the side so

9   I can continue on and weigh all the organs.  Nothing else.

10       Q.    Do you ever retain the notes that you use?

11       A.    Yes, in some occasions we do, but it depends on

12  the -- I guess the amount of space that we have to maintain

13  all of the files that we have available.  What I mean by

14  that, if we go on multiple, multiple years, then I purge

15  what we have from previous times, because it's going to be a

16  listing of everything that's in my report.

17       Q.    Did you check to see whether or not you retained

18  the notes of your examination in this case?

19       A.    Yes, and what was present there was a diagram that

20  was noted on this particular case.  I do have a diagram on

21  this case and I found it just before I came in, which was

22  amazing because I generally don't have everything as

23  organized for every year.  I did find a diagram.

24       Q.    When you say diagram, what are you referring to?

25       A.    A diagram that is used at the time of autopsy plus

Michael Chambliss, M.D.                                      34

1    a few written notes that were done in the process, not only

2    the diagram itself but a paper with written notes on it

3    right at the time I'm working.

4         Q.   Can you provide copies of that to us?

5         A.   Yes, I can.

6              MR. BARONE:  Is it possible to do it now?

7              MR. MURPHY:  If we take a short brake.

8              THE WITNESS:  Sure.

9              MR. MURPHY:  How long would it take?

10             THE WITNESS:  Maybe I can have one of those

11   guys -- let me call them otherwise I have to go back in and

12   go back out.  I can do it.

13             MR. MURPHY:  We'll take a break.

14                  (Brief recess was taken.)

15                  (Whereupon, Exhibit 12 was

16                   marked for identification.)

17             MR. MURPHY:  Back on the record.

18   BY MR. MURPHY:

19        Q.   Doctor, you went to go find the notes that you

20   prepared of this examination and you provided them to us

21   here.  We're attaching these Exhibit 12.  Does Exhibit 12

22   represent the entirety of the notes of your examination?

23        A.   Yes, it does.

24        Q.   Let's discuss those notes.  The first page of

25   Exhibit 12 is a copy of a folder in which these notes were

Michael Chambliss, M.D.                                    35

1    found; is that correct?

2        A.    Yes.

3        Q.    It states the report was dictated on September 29,

4    2011 and completed on November 15, 2011, correct?

5        A.    That's correct.

6        Q.    Do your know why there was a delay between when

7    the autopsy was conducted and when this report was

8    dictated?

9        A.    Primarily because of caseload.  We have a priority

10   of which cases get dictated or requested and we try to

11   follow through and answer those particular requests, and for

12   that reason, I try to write extensive notes for the

13   possibility of that occurring, so that's my opinion of why

14   it was dictated so long afterwards.  I had the notes

15   prepared, but it wasn't dictated right away.

16       Q.    Then there was another delay between the time it

17   was dictated and the time it was completed on November 15,

18   2011, do you know why there was that delay?

19       A.    The cases -- I recall at the very end of the

20   report it's typed up pretty much the following day after

21   it's been dictated, and it's a matter of going through and

22   pulling out which ones you want to get signed off.  We have

23   a backlog of cases and probably what I was doing was going

24   down and pulling out as many cases as I can to correct,

25   correct, correct.  And just sign it off.  It's more of a

Michael Chambliss, M.D.                                            36

1    paper -- how should I say it?

2              (Interruption at door.  Fire alarm went off

3         resulting in a change of location of deposition.)

4                    (Brief recess was taken.)

5         (Deposition recommencing at Fresno County Morgue.)

6    BY MR. MURPHY:

7         Q.    Going back to the dictation date, you dictate your

8    report based on notes you completed?

9         A.    Not only based on notes I complete but also based

10   on what the caseload is.  If I'm able to get right to them,

11   I'll dictate right away.  Sometimes I'll dictate ten at a

12   time, once I've written all the notes on each case.  It may

13   not reflect directly at that time.  That's why I try to

14   write extensive notes right after the case.

15        Q.    Within Exhibit 12 do we have the notes you took

16   after your examination?

17        A.    Yes, there are two sets of notes.  There are a few

18   notes that are -- I guess for me it would be Page 5.

19   There's a half page of written notes that were taken at the

20   time I was doing the autopsy.  That will be added with, of

21   course, the diagram.  I would be working on the diagram for

22   the organ weights and then putting a few notes at the time

23   I'm in the autopsy.  And the following pages there are two

24   full pages of written notes which were written at the time I

25   completed the autopsy.  So I would sit down right after the

Michael Chambliss, M.D.                                      37

1    time I finished the autopsy, fill in all the information

2    from the case itself as far as organ systems, injuries and

3    whatever from -- I have kind of a template that I follow

4    after doing it for so long.  I go through and fill in all

5    the information.

6        Q.    That's what's in these two pages of notes that

7    you're talking about?

8        A.    Yes.  That would have been at the completion of

9    the autopsy, sitting down, writing all the information on

10   that particular date, the 13th of June 2011.  That's what's

11   in the upper right-hand corner of Page 1 it says and that

12   would have been when I sat down and wrote those particular

13   notes.

14       Q.    There's a No. 1 in the top right corner in the

15   page you're referring to as well?

16       A.    Yes.

17       Q.    The pages that you're talking about you refer to

18   the notes after the examination are Page 1 and following

19   that?

20       A.    That's correct.

21       Q.    You have pretty good handwriting, now that we have

22   these I'm going to ask you to read them into the record so I

23   know exactly what you say.

24       A.    Starting at Page 1 at the very top, Fiailoa Saupo

25   Edwards.  Just above that, I have written GI track, which is

Michael Chambliss, M.D.                    38

1  gastrointestinal track:  Esophagus is okay, small amount of
2  residual food in the stomach.  Then the first line at the
3  top of that page should say cavities:  Fibrous adhesions in
4  each thoracic cavity (a circle around R greater than a
5  circle around L,) which means right greater than left; a few
6  adhesions over the right lobe of the liver; appendix
7  present, hemorrhage, which is abbreviated.  ST, which is
8  soft tissue over the front of the pericardial sac.  So ST
9  represents soft tissue over front of pericardial sac, and I
10 have (horizontal fracture of the sternum), which indicates
11 the hemorrhage of the soft tissue as a result of the
12 horizontal fracture of the sternum; fractures of both
13 clavicles, abbreviated as CLAV; horizontal fracture of C7,
14 which is the 7th cervical vertebra/T1, thoracic vertebra 1
15 junction with probable fracture of posterior left first rib;
16 fracture of right side of C3 vertebra, which is the third
17 cervical vertebra; prominent arthritic changes of
18 middle-lower thoracic spine (? FX), which is fracture).
19 That's all under the category of cavities.
20         The next category is Neck organ:  Hemorrhage
21 abbreviation of muscles on top of each shoulder (fractures
22 of clavicles) and front of lower cervical spine, indicating
23 there's hemorrhage over the front of the lower cervical
24 spine; neck muscles okay; the larynx/epiglottus/hyoid bone
25 okay, indicating there's no finding in any of those

Michael Chambliss, M.D.                              **39**

1    structures; large, which is capital BM, which is bite mark

2    on the left side of the tongue; thyroid gland okay, which

3    means no problems with the thyroid gland.

4           New category says lungs:    Beneath the lungs I give

5    the weight of the lungs (R, which is right 685; left equals

6    615).    Under that category it says adhesions (plural) with

7    focal contusions present, indicating contusions of the

8    lungs, congestion/edema present; no lacerations; sclerosis

9    of the cartilages () which is indicating there's narrowing

10   of the upper trachea due to sclerosis of the cartilages.

11          We'll go to the category for heart and I gave the

12   weight as (610 grams) enlarged atria; mild redundancy of the

13   MV leaflets, which is the mitral valve leaflets; other

14   valves are okay; myocardium of LV, which is left ventricle

15   with multiple pale, P-a-l-e, (light LGT, white WHITE) areas

16   in the IVS, which is intraventricular septum/posterior wall

17   (from base of the heart to the apex of the heart); coronary

18   arteries with focal calcification (MOD, which is moderate of

19   the proximal, P-r-o-x-l-a-d, left anterior descending/middle

20   RCA, right coronary artery), which indicates the mild

21   calcifications in those two locations, but otherwise free of

22   athero, A-t-h-e-r-o, which means atherosclerosis.

23          Next category, liver (2055) congested rib/brown on

24   the external/cut surfaces; GB, which is gallbladder/BT,

25   biliary track, are okay.    No stones seen.

Michael Chambliss, M.D.                                    **40**

1    Next line it says right leaflet of diaphragm

2    partially attached to the right lobe which indicates it's

3    not separate, it's adhesed to the right lobe.

4    The next category says spleen (195) slightly soft

5    but otherwise normal on external and cut surfaces, negative

6    significant lymph adenopathy.

7    Next category is kidneys, I give the kidney

8    weights of right equal 208; left equal 223, both kidneys

9    have small single corticocysts, and I put above the small

10   (2cm), which is two centimeters, on cut surfaces.  There are

11   two centimeter size corticocysts on cut surfaces of the

12   kidneys.  I have a dilated pelvic region in the right

13   kidney, secondary to a large stone with additional

14   calcifications in the calyces.  Both kidneys are very

15   congested on the external and cut surfaces.  The urinary

16   bladder contains urine.  The mucosa of the bladder is okay.

17   The prostrate gland is moderately enlarged and has prominent

18   induration of fatty tissues around the vas deference, which

19   is around the back side.  That's completion of the Page 1.

20   The notes at the bottom it has (over) and at the

21   top of the next page it has pancreas (361):  An increased

22   amount of attached fat with some fat infiltration of the

23   gland; the adrenals are autolized; the thyroid was described

24   above.

25   The next category it has MS system, which is the

Michael Chambliss, M.D.                                    **41**

1   musculoskeletal system: (see injuries-sternum, lower C7-T1

2   part of the spine, C3 on the right side and both clavicles).

3            Next category I have is brain/scalp/skull:  The

4   word after that is (puffy), indicating that the soft tissue

5   of the face has a very puffy appearance, (hematoma of the

6   entire forehead frontal region of the scalp); extensive

7   hemorrhage of the reflected scalp and outer skull, and then

8   I have (negative fracture); these are all initials, negative

9   SDH/EDH/SAH indicating no hemorrhage present inside the

10  skull.

11           The next line it says brain on cut surface is free

12  of injury.  The ventricles of the brain are okay; the floor

13  of the skull is okay.

14           Beneath that I have separate categories, I have

15  TOX, which is the toxicology which was taken during the

16  autopsy.  It's blood, urine and vitreous.  And then a

17  separate column, I have tissue stock, which indicates I took

18  sections of each organ and saved in formaldehyde.

19           The next column it has COD, which is the cause of

20  death: H, which indicates head/N which indicates neck/CH

21  which indicates chest INJ injuries.

22           The next line is MVC, which is motor vehicle

23  collision-driver.

24           Beneath those columns I have an additional column

25  which has a heading of preliminary findings.

Michael Chambliss, M.D.                                    42

1          I, with the initials BFI, which is blunt force

2    injuries of the H head/N neck.   Beneath that indent it has A

3    fracture of the lower cervical spine (C7-T1); indent B

4    fracture of the upper C spine (C3); and then indent C

5    extensive scalp injuries (hematoma); and then indent D

6    evidence of face, neck.   I can't read that one.

7          Beneath that it has (hematoma of right neck and

8    abrasion over right cheek).

9          II, blunt force injury of the chest, indent A,

10   fracture of the upper sternum; indent B, pulmonary

11   contusions; indent C possible fracture of the thoracic

12   spine.

13         III, cardiomegaly (610) for the weight of the

14   heart.   And that's the information on the pages.

15        Q.    Let me ask you a couple questions on that.   You

16   noted on Page 1, which you just read on the neck organ

17   section.   I believe what you said is there's a hemorrhage of

18   muscles on top of each clavicle, fractures of clavicles in

19   front of lower C spine, correct?

20        A.    On top of each shoulder, but that's associated

21   with the fracture of the clavicles, and yes, front of the

22   lower cervical spine.

23        Q.    Were you saying hemorrhage or fracture, what was

24   on the front of the lower C spine?

25        A.    Hemorrhage.   That's visible on some of the

Michael Chambliss, M.D.                              43

1    photographs.

2        Q.    Why don't you take a look through those

3    photographs.  First, let me ask you this question.  Is that

4    noted in your report as well after it's been dictated and

5    typed up?

6        A.    Hopefully.  On Page 3 of my report, it says, "The

7    muscles of the neck show extensive hemorrhage associated

8    with the fractures of the top of the shoulders."  It

9    actually says clavicles, so it's not stated as clearly as

10   what's in my notes.  It should say -- the fractures of the

11   clavicles are associated with the hemorrhage of the muscles

12   on the top of the shoulders, but this isn't as specifically

13   or clearly stated for that.

14       Q.    The front of the lower C spine, is that the same

15   thing?

16       A.    No.  That's not stated.  What should be -- what's

17   not stated is the very last sentence under Neck Organs where

18   there's a horizontal fracture of the C7-T1 junction has

19   hemorrhage with that.  I didn't specify there's hemorrhage

20   right in that location.  It's a finding you get with the

21   fracture, but I didn't specifically say you have this

22   fracture and you also have this hemorrhage on top of it

23   indicating there's a fracture here.

24       Q.    Can you indicate that in the photographs that you

25   have in front of you here?  If you don't mind keeping them

1  in order, that would be helpful.

2      A.    That's what I'm doing.

3            MR. BARONE:  Was that Exhibit 10, the photos?

4            THE WITNESS:  Yes.  Exhibit 10, No. 43 shows

5  hemorrhage of muscle -- soft tissues over the top of each

6  shoulder.  What we have is the skin and soft tissue pulled

7  back.  We're looking respectively as you're looking directly

8  on it, to your right would be the individual's left

9  shoulder, looking to the left of the photo would be the

10 individual's right shoulder and we see some dark purple

11 areas on the top of the shoulders, which are in association

12 with fractures of each clavicle.

13 BY MR. MURPHY:

14     Q.    Are those visible through an external examination

15 or only internally?

16     A.    They're visible only during the internal

17 examination, but I've noticed as I was going through the

18 photos up to Photo No. 43 that there's a purple area on the

19 right side of the base of the neck of Mr. Edwards in the

20 area of the right clavicle.  There is a purple area on the

21 right side, but nothing that I could see on the left side as

22 I was going through.

23     Q.    Would you please circle the areas that you're

24 referring to right or left and put R and L by them with that

25 black pen?

Michael Chambliss, M.D.                    45

1       A.    (Witness complies.)

2       Q.    What number is the photograph that you're making

3  marks on?

4       A.    No. 43.

5       Q.    That's Exhibit 10-43 that you made those marks on.

6  Those indicate that hemorrhage you saw near the clavicles;

7  is that correct?

8       A.    That's correct.

9       Q.    Do any of the photographs indicate the

10 hemorrhaging that you documented in your notes around the C

11 spine?

12      A.    Exhibit 10, Photo 66 is actually a photograph

13 after the neck structures have been removed.  We have a gray

14 photo card just above an area of hemorrhage over the front

15 of the lower cervical spine.

16      Q.    Was that visible on the external exam as well or

17 just the internal exam?

18      A.    This was an internal exam photograph, so it was

19 not visible on the external.  It was only visible after

20 taking all of the neck structures, larynx, tongue,

21 epiglottis and everything on top of this.  Once that's

22 removed, you can actually see the location of the fracture

23 of the lower cervical spine, thoracic spine juncture.

24      Q.    Would you circle that area you're referring to?

25      A.    (Witness complies.)

1    Q.    That's Exhibit 10 photograph --

2    A.    No. 66.

3    Q.    Do you know why that wasn't noted in your

4    report?

5    A.    An oversight on my part as far as the hemorrhage.

6    Again, sometimes I'll just indicate there's a fracture there

7    and say that -- and don't describe where the hemorrhage is,

8    it's right in the same location.  It's an indication of the

9    location of where the fracture is.  There are actually -- in

10   this Photograph 66 was hemorrhage over the lower fracture

11   and Photograph 67 is over the upper fracture.  But I didn't

12   record the hemorrhage itself, but I recorded the

13   fractures.

14   Q.    Do you have any opinion regarding the amount or

15   direction of force that would be needed to cause that

16   injury?

17        MR. BARONE:  Objection, calls for speculation

18   lacks foundation.

19        THE WITNESS:  There's no way for me to know the

20   amount.  There's no way to test that.  So I can't say.

21   BY MR. MURPHY:

22   Q.    As to the direction?

23   A.    The direction, that's also something I can't tell

24   either.

25   Q.    Is that true in regard to all the injuries that

Michael Chambliss, M.D.                          47

1  you saw or just on certain of them?

2       A.   With respect to -- I'm not sure what your question

3  is.  Rephrase your question.

4       Q.   I'll come back to it.  What does cut surfaces mean

5  when you're talking about the liver or spleen?

6       A.   Cut surfaces mean once you made a cut you're

7  looking at what the inside is.  The surface on the inside as

8  opposed to what you notice on the outside.

9       Q.   Going back to the second page in your notes, in

10 the brain section, the SDH/EDH/SAH, what do those stand

11 for?

12      A.   Subdural hematoma is SDH, epidural hematoma is

13 EDH.  Give me the last one again?

14      Q.   SAH?

15      A.   Subarachnoid hemorrhage would be SAH.

16      Q.   The line below that, do you have your notes

17 there?

18      A.   Yes.

19      Q.   The brain on CS?

20      A.   CS would be cut surface.

21      Q.   You actually would cut the brain, and how would

22 you have done that?

23      A.   What you do is you take a look at the entire

24 outside.  You turn the brain face up to you and you take a

25 knife and you make coronal sections or what we call bread

Michael Chambliss, M.D.                           48

1    loaf type of sections down the entire brain itself and you

2    look on each side of the cut slice of brain and look if

3    there's any obvious hemorrhage or any indication of injury

4    there and that's why I said cut surfaces are free of injury

5    on cut sections are free of injury.

6              MR. BARONE:   May I ask a question?

7              MR. MURPHY:   Absolutely.

8              MR. BARONE:   On Page 2, you talk about the

9    SDH/EDH/ADH, you have a mark there.  Does that mean it was

10   negative for fracture in those areas?

11             THE WITNESS:   You mean in front of SDH?

12             MR. BARONE:   There's a minus sign with a circle in

13   front of fracture, and then there's a minus sign in front of

14   SDH/EDH/ADH.

15             THE WITNESS:   I use a minus sign to mean minus

16   sign negative for fracture, minus sign negative for subdural

17   hematoma, epidural hematoma and subarachnoid hemorrhage.

18   It's all negative.

19             MR. BARONE:   Thank you.

20   BY MR. MURPHY:

21        Q.   Going down to your preliminary findings, there

22   are -- what's Item D?  Can you read that Roman Numeral I?

23        A.   I'd have to look on the sheets that I have to get

24   the last part of -- D evidence of face/neck and I can't read

25   that next word.  I'll have to see if it's clearer on the

Michael Chambliss, M.D.                    49

1    original page that was copied.  Evidence of face/neck

2    compression (hematoma of the right neck/abrasion on right

3    cheek).  What that indicates is there's an actual pattern

4    type of injury on the right side of the neck in which the

5    face and neck were compressed against something.

6         Q.    You're talking about the right side of the face

7    and neck, correct?

8         A.    That's correct.

9         Q.    Hematoma of right is what in the parentheses

10   there?

11        A.    Right cheek.  It should say hematoma of right

12   neck/abrasion on right cheek.  Sorry it didn't come out as

13   clearly on the copy.

14        Q.    Can you look through the photographs and circle

15   the areas you were referring to when you were referring to

16   the hematoma on the right neck and abrasion on the right

17   cheek?

18        A.    (Witness complies).  On Photograph 2 under Exhibit

19   10, there is a purple area on the top of the right shoulder

20   with a pattern injury on the right side of the face just in

21   front of the ear.  See the purple area at the very bottom

22   here, which is a hematoma.  You also see a pattern injury on

23   his right cheek just in front of the hairline, which is more

24   like an inverted C.  That would be more of a pattern just in

25   front of his hairline on the right cheek.  It's hard to

Michael Chambliss, M.D.                    50

1    describe a hematoma, but there's purple in this same

2    location of where you would get a hematoma in the neck area

3    that's actually purple there and swelling of the cheek area

4    along with it.

5         Q.    Will you circle the entirety of the area that you

6    were referring to when you wrote what we just discussed in

7    your notes?

8         A.    (Witness complies.)

9         Q.    Put a 1 by that area.  Connect it with a line to

10   No. 1 so we know what you're referring to.

11        A.    (Witness complies.)

12        Q.    In your report, you also refer to -- if you'll

13   look at the first page under external examination -- a

14   patterned abrasion over the right side of the head and neck.

15   Do you see that?

16        A.    Yes, I do in the third paragraph under external

17   examination, the very bottom paragraph on Page 1.

18        Q.    Is that also depicted in the photograph that you

19   just --

20        A.    That is what I was trying to describe is that

21   inverted C-shaped injury is an abrasion that has a pattern

22   to it.

23        Q.    You described it further on the next page of your

24   report under the heading of Evidence of Injury under No. 4,

25   correct?

Michael Chambliss, M.D.                    51

1       A.    That's correct.  I gave measurements to it at that

2    time.  In the initial external exam it was more of something

3    I noticed.  Under Evidence of Injury, I gave some dimensions

4    to it.

5       Q.    Would you please circle the patterned abrasion

6    area that you indicated here on Page 2 of your report under

7    Evidence of Injury under heading Roman numerals I-IV?

8            MR. BARONE:  On the photograph?

9            THE WITNESS:  On the photograph itself?

10   BY MR. MURPHY:

11      Q.    You were pointing to it earlier with your finger,

12   I'm just asking you to circle it so we have it for the

13   record.

14      A.    (Witness complies.)

15      Q.    Place a 2 by that so we know what you're referring

16   to.

17      A.    (Witness complies.)

18      Q.    Do you have any opinion as to the amount or

19   direction of force that caused that pattern abrasions?

20           MR. BARONE:  Objection, calls for speculation,

21   lacks foundation.

22           THE WITNESS:  No, I don't.

23   BY MR. MURPHY:

24      Q.    One last question about your notes here, the

25   preliminary findings that you listed in your notes, which

Michael Chambliss, M.D.                          52

1    are Exhibit 12 aren't -- on Page 56 your report, there are

2    some additional things listed under the section entitled

3    Pathological Diagnosis that aren't listed under your

4    preliminary findings of your notes on Exhibit 12.

5          A.    Yes.

6          Q.    I'm just curious as to what might have changed to

7    compel you to include those in the final report?

8          A.    In the pathologic diagnosis, you can include

9    anything of pathology in the report.  When I wrote my

10   initial notes, my notes have other items that are pathologic

11   findings, which for me a preliminary autopsy findings, just

12   writing notes, there's always a possibility I'm going to

13   include some other items at the end once I write my full

14   report.  What's included on No. 3 on my pathologic diagnosis

15   on my final report is more clarification of some of the

16   findings noted in my notes, like the heart areas, fibrosis,

17   the coronary arteries.  They're just more of the pathology

18   that you find throughout your report.  It's more to be

19   complete.

20         Q.    Before we started on your notes, the page with the

21   No. 1 with the top right corner of Exhibit 12 there's a page

22   in front of that, which also has your handwriting on it?

23         A.    Yes.

24         Q.    What would you describe that as?

25         A.    Those were notes that were taken during the

Michael Chambliss, M.D.                              53

1    autopsy procedure itself.  At times instead of going back

2    and directly to the diagram, I would have another piece of

3    paper close by that I could inscribe some notes on there

4    that I could continue on and make the process go a little

5    quicker.

6         Q.    Can you read these notes for us?

7         A.    I'll just kind of go through the top portion and

8    begin at that location.  I have circumcised, indicating the

9    penis is circumcised.  I have a description of the injury to

10   the forehead as being described as a boggy area of forehead

11   and frontal scalp measuring five inch by four inch.  I have

12   a group of words that says BLK mustache, which indicates a

13   black mustache, NAT/good, which means natural teeth in good

14   repair.  (Blood) indicating some blood in the area of the

15   mouth.  Also I have (straws over the clothes).  On the left

16   upper portion of the page, I have blue -- describing the

17   clothing, I have blue/black striped briefs, blue/white

18   striped short sleeve pole shirt for the clothing.  And then

19   just to the right of that, I have 4 EKG, indicating there's

20   some evidence of medical treatment on the body.

21            Up to the right-hand portion of the top of the

22   page, I have a description of the personal affects found in

23   his clothing, which is a wallet in the left pocket of his

24   black sweater with $101, multiple cards and personal papers.

25            About the middle portion of the page on the left I

1   have toe nails medium/clean.  Just to the right of that, I

2   have multiple, M-u-l-t, flat scars over the shins.  Then I

3   have a surgical scar measuring two and a half inch by three

4   quarter inch linear scar on the inner left ankle.  Just

5   beneath that I have an abrasion on the inner left elbow.

6           Then below that I have a list of six different

7   items numbered.  No. 1 item says horizontal fracture of the

8   sternum at the first and second ribs.  No. 2 says fracture

9   of L clavicle/R clavicle.  The No. 3 item says hematoma on

10  top of right shoulder, measurement three inch by two inch.

11  The No. 4 item is measurement of the pattern abrasion on the

12  right cheek and jaw measuring three and a half inch by one

13  and a half inch.  No. 5 I have hemorrhage, H-o-m-o-r-r-h,

14  without a specific indicator for where that's from.  The No.

15  6 item says extensive hemorrhage on the reflected

16  scalp/outside of skull (minus signs, which means negative

17  for fsx, fractures, so no skull fractures).

18      Q.   What is on 5 again?

19      A.   No. 5 says hemorrhage, but I don't have any

20  specification for what it's associated with.  Obviously, I

21  was writing it and later on I elaborated on it in my notes

22  at the end of the autopsy.

23          MR. BARONE:  I'm sorry, did you say No. 5 on Page

24  2 says hemorrhage of your notes below circumcised?

25          THE WITNESS:  It's on that same page.  I have

Michael Chambliss, M.D.                                55

1    H-o-m-o-r-r-h, abbreviation for hemorrhage.

2              MR. BARONE:  I look to the right on No. 6 and your

3    hemorrhage looks different there.

4              THE WITNESS:  I gave the entire spelling for

5    hemorrhage on that one.  I abbreviated hemorrhage for 5 and

6    No. 6, I spell it out.  That's the difficulty with notes

7    when you're trying to transcribe and write some abbreviation

8    and keep moving.  Sorry for that.

9    BY MR. MURPHY:

10        Q.   Do you have any idea which hemorrhage you're

11   referring to when you wrote that note for No. 5?

12        A.   No, I don't.  There's are a couple locations where

13   there would be hemorrhage in this case.  That hemorrhage

14   could refer to what's in some of the photographs over the

15   front of the heart or it could refer to the hemorrhage on

16   the front of the cervical spine or top of the shoulders.  It

17   could be any of those items.  I can't tell you what I was

18   thinking at the time because I had completed the internal

19   exam as No. 6 had already gotten to the scalp and skull.

20        Q.   This may have been some of the internal

21   hemorrhaging that you documented?

22        A.   Yes, it was somewhere along the line, because by 6

23   I had already got to the head area which is the last item we

24   do.

25        Q.   Let's go back to your report, the actual formal

Michael Chambliss, M.D.                          56

1    report which you prepared.  Going back to the first page of

2    that, which would be within Exhibit 9-A.

3        A.    Just a second please.

4        Q.    I just wanted to get your attention to the first

5    page of that autopsy report there.

6        A.    Yes.

7        Q.    Under External Examination, it says no significant

8    eternal (sic) injuries?

9        A.    Missed a correction, I should have made.  No

10   significant external injuries, which is incorrect.

11       Q.    How is that incorrect?

12       A.    There are some significant external injuries that

13   are noticed on the face and noticed on the shoulder, that

14   are noticed in a couple spots.

15       Q.    Which are you referring to?

16       A.    What ended up happening is probably I didn't read

17   correctly on this particular portion of reviewing my report.

18   So this is an error on my part.

19       Q.    Which external injuries that you're referring to

20   would you consider to be significant?

21       A.    In this particular case, I would probably be

22   referring to the torso and the extremities, the lower

23   extremities, because anything else that is present on

24   Mr. Edwards, they're located to the shoulder area and the

25   face and left elbow area.

Michael Chambliss, M.D.                                    57

1      Q.    Facial, shoulder and elbow injuries you consider

2  to be significant external injuries?

3      A.    External, because looking at the body, you

4  wouldn't know any internal injuries noted just by doing his

5  external exam.  For clarification, there's no way to get

6  around it.  He does have significant external injuries but

7  they're in the head area, neck area and left arm.

8      Q.    Those would be the injuries we discussed earlier,

9  the pattern abrasion to the face, the hematoma and fracture

10  to the shoulders; is that correct?

11      A.    Yes, all to that region of his body.

12      Q.    And also the elbow injury?

13      A.    The elbow area is an external injury, but the

14  depth of that injury is not the type that would be life

15  threatening.

16      Q.    Would you consider it to be a significant

17  injury?

18      A.    No, that wouldn't be, in my way of categorizing

19  injuries, significant enough that it would produce either

20  immediate death, pending death, anything along the lines of

21  possible death.

22      Q.    Which of the injuries that are -- what is your

23  definition of significant external injury?

24      A.    Significant external injury is associated with the

25  possibility of excessive bleeding or could be associated

1  with internal injuries that could result in death, either

2  immediately or over time can result in death.  An injury to

3  the left elbow area that's a scrape is not the type of

4  injury that, to me, could bring about a person's death.

5      Q.    Which of the injuries that you documented on

6  Mr. Edwards should have been characterized as significant

7  external injuries?

8      A.    Again, the head area, which is a very boggy area,

9  which is on the forehead and frontal scalp, the right cheek

10 area, both because they have underlying findings which go

11 along with what you see externally and also the bruise on

12 the top of the right shoulder near his clavicle because you

13 have underline fracture in that location.  It's not only a

14 finding of an external injury, but what do you find under it

15 that indicates a significant amount of force, blunt force

16 that could eventually result in the individual's death or be

17 associated with findings that could cause death.

18     Q.    The clavicle injury would be something that you

19 would consider to be a significant injury?

20     A.    Yes.

21     Q.    In what way would the clavicle injury be a

22 significant external injury?

23     A.    It depends upon whether the clavicle extends into

24 the cavity, the thoracic cavity area.  If you get a fracture

25 of the clavicle that disrupts into the thoracic region, you

Michael Chambliss, M.D.                                    59

1   may get a collapsed lung.  It has the potential to create

2   complications in the case.  If it stays intact and does not

3   dislodge, it may not have as much significance, so it

4   depends on the circumstance.

5        Q.    In this instance did any of the decedent's

6   clavicle injuries disrupt his thoracic cavity?

7        A.    No, but you have a fracture of the right side of

8   the third cervical vertebra, which is not too distant from

9   where you have a fracture of the clavicle.  What you end up

10  having is you have two closely associated injuries which you

11  don't separate, you just don't -- they're in close enough

12  proximity that you can't say these are totally isolated type

13  of injuries.

14            MR. BARONE:  Can I ask a quick question?

15            MR. MURPHY:  Sure.

16            MR. BARONE:  Did you take any x-rays?

17            THE WITNESS:  No.

18            MR. BARONE:  Any CTs, MRIs?

19            THE WITNESS:  No.  Back at this time in particular

20  we didn't have the ability to take CT scans and we don't

21  take x-rays on nonhomicide type cases.  I would put it that

22  way.  Most motor vehicle accidents -- I would say almost all

23  motor vehicle accidents we wouldn't take x-rays because

24  internally we could pretty much determine what the fractures

25  are, so no.

Michael Chambliss, M.D.                    60

1   BY MR. MURPHY:

2        Q.   Going back to your report, you noted on the first

3   page a deep contusion present over the forehead and frontal

4   scalp; is that correct?

5        A.   Yes.

6        Q.   You also noted that under the Evidence of Injury

7   section on the second page?

8        A.   Yes.

9        Q.   Can you identify that injury in the photographs

10  that you have in front of you there?

11       A.   It's actually visible in the Exhibit 10,

12  Photograph No. 22.  You can see a large purple area on the

13  right side of the forehead.  It may involve the entire

14  forehead.  It's difficult for me to tell on a

15  one-dimensional type of photograph such as this, but you can

16  see a purple area which is --

17       Q.   Go ahead and circle it with the black pen.

18       A.   -- located near the hairline of the right frontal

19  scalp.

20       Q.   Put a 3 by that.

21       A.   (Witness complies.)  Which actually extends up

22  into the frontal scalp.  I have forehead area and frontal

23  scalp.  It does go up into the hairline of that location.

24       Q.   You've circled the area that's visible, but there

25  may be more hemorrhage below the headline?

Michael Chambliss, M.D.                                    61

1          A.    Yes, I have a measurement of it, five inch by four

2     inch on Page 2.

3          Q.    In any of the abrasions that you -- you also

4     documented an abrasion to the decedent's elbow, correct?  If

5     you look at Page 3 it's referred to there under the arms,

6     legs and shoulder portion of the Evidence of Injury.

7          A.    Yes.

8          Q.    Would you circle that in the photographs?

9          A.    (Witness complies.)  On Photograph No. 41 of

10    Exhibit 10 there is a gray card just above the inner portion

11    of his -- Mr. Edwards' left elbow, which has a reddish brown

12    scrape which would be the abrasion described in my report.

13         Q.    Which number photograph is that of Exhibit 10?

14         A.    No. 41.  Actually, it's better seen on 42 as

15    well.

16         Q.    Go ahead and circle on 42 as well?

17         A.    (Witness complies.)

18         Q.    Looking through those photographs, there are a

19    number of foreign objects on the decedent when he arrived at

20    the coroner's office; is that correct?

21         A.    Yes.

22         Q.    You noted that too, I believe straw was

23    indicated?

24         A.    Yes, straw.

25         Q.    During your examination, did you examine the

Michael Chambliss, M.D.                                    62

1   decedent's body for any foreign objects that were embedded

2   within his wounds?

3        A.    No, I didn't go into any depth looking at any

4   wounds as far as foreign objects.  None of the wounds were

5   scraped to any degree -- the skin surface away to any degree

6   to see any deeper injury or ulceration of the skin surface,

7   which means what you see on the skin surface abrasion-wise,

8   there are primary abrasions and contusions on the skin

9   surface, so there's nothing really to look for embedded

10  material.

11       Q.    You didn't look for any embedded material?

12       A.    No, because there's nothing that -- if there's

13  straw, there's straw.  I could see straw.  I didn't see any

14  deeper skin surface disruption that contained foreign

15  debris.  Not seeing it, I didn't pursue it any further.

16       Q.    Going back to that boggy deep contusion over the

17  forehead.

18       A.    Yes.

19       Q.    You describe that in your report.  What is meant

20  by a boggy contusion?

21       A.    It means you have, I would say, a collection of

22  fluid beneath a contusion itself.  It's actually blood.  You

23  get not only the discoloration and the hemorrhage itself in

24  the soft tissue, but the amount of impact to that location

25  will create an enclosed area of blood, and it has what we

Michael Chambliss, M.D.                    63

1   call boggy.  You press it in, it has a somewhat edemas type

2   of feel to it.  You press in, you can feel fluid under

3   there.  In this particular case it's blood.

4        Q.   Do you have an opinion as to the amount of

5   direction of force that would be used to cause such injury?

6            MR. BARONE:  Objection, lacks foundation, calls

7   for speculation.

8            THE WITNESS:  No, we see it on some occasions, but

9   there's no way for me to know the direction of force or the

10  amount of force required.

11  BY MR. MURPHY:

12       Q.   Is it something that's caused by more force than a

13  normal contusion?

14       A.   Again, it depends -- the scalp is an area that has

15  quite a bit of blood vessels.  It can bleed very easily.

16  You have an impact to a location where there are a lot of

17  blood vessels and it's over a larger surface, but you're

18  not -- it's a pressing type of injury.  What I mean by that

19  is you don't scrape the surface, you impact it very hard.

20  The degree, I can't tell you.  I can't tell you it's in this

21  direction.  I can't tell you it takes 10 pounds or 20

22  pounds.  There's no way for me to quantify the amount of

23  impact.  It's a deeper type of injury and we do see those in

24  motor vehicle collisions.

25       Q.   Do you see those injuries predominantly in any

1  type of collision, such as rollover accident?

2      A.    You can't say it's more likely rollover.  You can

3  see it in head-on collisions, side impacts.  It really is an

4  indication of how much -- location of the larger area of the

5  head impacting something pretty solidly and collecting blood

6  in the soft tissues.  It's not a directionality thing to it.

7  It's not specifically located with rollover accidents.

8      Q.    Going back to the elbow injury that we discussed.

9  Is the abrasion that you saw there consistent with what

10  could be referred to as road rash?

11      A.    Well, it could almost be the type that you would

12  see with more like a burn type of abrasion.  It's a scraping

13  type of abrasion, but it's localized so much that you can't

14  just call it a road rash.  You tend to get not just one

15  location, you get multiple locations around it that give you

16  more road rash.  That's more in a protected spot.  The elbow

17  area is somewhat protected so you would tend to get

18  something around that spot as well.  I wouldn't just say

19  it's road rash.  If a person is found in the grass, then to

20  me it's not road rash.

21      Q.    Are you familiar with that markings can be left on

22  a person's body by a seat belt?

23      A.    Yes.

24      Q.    Did you see any of those markings on this

25  individual?

Michael Chambliss, M.D.                                    65

1      A.    No external markings on the individual.

2      Q.    What about internally?

3      A.    Internally you may get fractures of the clavicles,

4  you may get some fractures across the sternum.  You may get

5  tears in the mesentery from the angled portion or shoulder

6  harness portion of the seat belt and you may also get some

7  lower intestinal injuries from the lap portion of the seat

8  belt.  Fracture of the clavicle is something that may be

9  associated with a seat belt in place, even though you may

10  not find an abrasion or any bruising on the neck area.

11      Q.    Did you form any opinions as to whether or not

12  those injuries were caused by the seat belt?

13      A.    No, because not having an indication -- not seeing

14  the vehicle, first of all.  Even though what's present in

15  the file I didn't have a good indication of all the

16  dimensions of the driver compartment, and there's no way for

17  me to know that specifically from a seat belt.

18      Q.    Moving on to the Evidence of Injury section of

19  your report there on the next page, Page 2.  How are you

20  able to determine the fractures of the cervical spine at C7,

21  T1 and at C3?

22      A.    I could actually see them, and you could see the

23  hemorrhage, first of all.  It's photographed, but it's not

24  recorded here as you brought out.  You could actually see

25  where the fractures are and the lower cervical spine area

Michael Chambliss, M.D.                                    66

1  right at the top of where the vertebrae start in the upper

2  chest.  You could actually see that fracture.  And the upper

3  fracture around C3 you could actually see that fracture as

4  well.

5      Q.    Based upon your examination, were you able to

6  determine whether or not there was any spinal cord injury

7  suffered in conjunction with those fractures?

8      A.    No, I didn't go any further as far as opening up

9  the location of where the fractures are in the spinal cord.

10 Some people do follow through and look for the depth of

11 hemorrhage, but I didn't go any further.

12     Q.    Based on your examination, you weren't able to

13 determine that?

14     A.    I can't give an opinion about what impingement

15 upon the spinal cord or direct injury to the spinal cord is

16 present or not because I didn't open up the vertebrae to

17 look inside the spinal canal.

18     Q.    Do you have any opinion regarding the amount or

19 direction of force necessary to cause any of the injuries

20 that you documented?

21        MR. BARONE:  Objection, calls for speculation,

22 lacks foundation and it's overbroad.

23        THE WITNESS:  These are injuries, as I mentioned,

24 that are very common in any motor vehicle collision.  The

25 amount of force, direction of force, I couldn't tell you

Plaintiff's Objections: Relevance Fed. R. Evid. 401; This question lacks sufficient foundation for this witnesses testimony regarding force requirements for a specific injury. The witness cannot give force opinion per his own admission. Further, the questions were very broad inviting very non specific responses without narrowing the types of accidents, vehicles, damages, rollovers v. rear-enders, etc. Any probative value outweighed by unfair prejudice, misleading the jury and confusing the issue-Fed. R. Evid.403

Michael Chambliss, M.D.                                    67

Plaintiff's Objections: Relevance Fed. R. Evid. 401; This question lacks sufficient foundation for this witnesses testimony regarding force requirements for a specific injury. The witness cannot give force opinion per his own admission. Further, the questions were very broad inviting very non specific responses without narrowing the types of accidents, vehicles, damages, rollovers v. rear-enders, etc. Any probative value outweighed by unfair prejudice, misleading the jury and confusing the issue-Fed R. Evid.403

1    specifically.   They're common in motor vehicle collisions.

2    BY MR. MURPHY:

3        Q.     Are the injuries that you documented on this

4    decedent common in motor vehicle accidents?

5        A.     Yes.

6        Q.     Is that regardless of the type of vehicle

7    involved?

8        A.     Yes, you will get -- some vehicles will -- you

9    will get certain regions of the body that will commonly get

10   injured in occupants of motor vehicle collision, both

11   drivers and passengers.   I'm not referring to pedestrians in

12   this particular discussion, but both drivers and passengers

13   can get certain regions of the body that are commonly

14   injured, such as the head region, neck region, the clavicles

15   can be injured, the chest region can be injured, to a lesser

16   degree the extremities, arms and legs.   The abdominal area

17   you commonly could get injuries to the liver and spleen.

18       Q.     Going to your external exam, you noted sclerosis

19   in the respiratory system, correct?

20       A.     Sclerosis of the tracheal cartilages is something

21   that can occur in individuals that have obstructive

22   respiratory problems, even sleep apnea.   When we open up the

23   cartilages of the airway, you can find it's very narrow as a

24   result of some underlining respiratory problems to a certain

25   degree or not.   They may be compromised a little or a lot.

Michael Chambliss, M.D.                                    68

1       Q.     You noted in your internal exam that the brain was

2    free of hemorrhaging, correct?

3       A.     Yes.

4       Q.     How did you determine that?

5       A.     Visually looking at the brain both on the outside

6    and when I cut the brain.  That means what we call the gross

7    level, visually looking at it, there's no signs of visible

8    hemorrhage.

9       Q.     Going to Page 5 of your report, I think you

10   mentioned earlier that the toxicology test is done as a

11   matter of course, correct?

12      A.     That's correct.

13      Q.     What were the results of the toxicology analysis

14   in this case?

15      A.     They were done by an outside lab, so they're not

16   part of my report, so I would have to just look here and go

17   through according to what they have.

18      Q.     Were any of the findings significant to your

19   conclusion in your report?

20      A.     Yes.  In the sense there was nothing present as

21   far as testing for drugs or alcohol that to me contributed

22   to the accident, I'll put it that way.

23      Q.     Let's talk about the pathological diagnoses here

24   that you have in your report on Page 5.  You described under

25   Item 1, blunt force injuries of the head and neck and we've

1    discussed those, correct?

2        A.    That's correct.

3        Q.    You also documented some blunt force injuries to

4    the chest and we've discussed those as well?

5        A.    Yes.

6        Q.    We haven't discussed the second one there.  You

7    documented some focal contusions on the lungs; is that

8    correct?

9        A.    Yes.

10        Q.    Explain what you meant by that.

11        A.    It means there are bruises over -- that are

12    visible from looking at the lungs as a result of trauma to

13    the rib cage.  So not only to the rib cage, you get obvious

14    trauma that resulted in the fracture of the sternum, but the

15    ribs themselves also absorb some of the trauma resulting in

16    bruising to the lung.

17        Q.    The pathological diagnoses section of your report,

18    I believe you discussed earlier contains any significant

19    pathological findings that you made, correct?

20        A.    It can contain injuries.  If there's no other

21    pathology found in the autopsy itself, then you have only

22    injuries under pathological diagnoses.  It can include both

23    injuries and other findings of note on that particular

24    individual as far as medical conditions or anything

25    pathology-wise.

Michael Chambliss, M.D.                                    70

1     Q.    You determined that the cause of death was head,

2   neck and chest injuries?

3     A.    That's right.

4     Q.    Going through your pathological diagnoses, you

5   documented No. 1 blunt force injury of the head and neck and

6   into the subheadings A, B, C and D, which of these would you

7   have considered to be potentially fatal injuries?

8     A.    A, B, C.

9     Q.    Were you able to determine the precise specific

10   cause of the decedent's death?

11     A.    No.  There's no way for me to determine precisely

12   the cause because any injury under No. 1 could be associated

13   with a cause of death.  A fracture of the upper neck, C3

14   could be severe enough to cause death, fracture at the lower

15   cervical spine potentially could be a cause of death.  Any

16   of those Items A through C can be associated with a cause of

17   death.  Even though the brain shows no visible external

18   injury, you can get noticeable injury at the microscopic

19   level sufficient enough to cause death.

20     Q.    Did you do any analysis of the brain on a

21   microscopic level in this case?

22     A.    No.

23     Q.    Are you familiar with the diffused axonal brain

24   injury?

25     A.    Yes, I am.

Michael Chambliss, M.D.                                    71

1      Q.    How would you describe that injury?

2      A.    It's an injury in which you may get findings of

3    very significant external injury.  You may get it to the

4    scalp.  You may get it to the skull.  And you look at the

5    brain and you see no visible hemorrhage to the brain and

6    even when you cut the brain, you may or may not find any

7    visible changes there.  Once you cut the brain, sometimes

8    you'll find small hemorrhagic areas directly down the center

9    of the brain from the frontal lobes all the way through the

10   cerebellum and brain stem, sometimes you do.  Sometimes you

11   don't.  It's a condition of blunt force injury to the head

12   in which the injuries are more at the axonal level of the

13   brain.  That's why they call it diffused axonal injury.  It

14   happens entirely throughout the brain at the axonal level.

15     Q.    Do you have an opinion whether or not a diffused

16   axonal injury occurred to this individual?

17     A.    It's a possibility that a diffused axonal injury

18   took place in this case due to the degree of impact that's

19   noted to the head itself.

20     Q.    The impacts that you noted to the head, in your

21   opinion, are those consistent with the decedent's head

22   contacting the ground during the accident sequence?

23     A.    It can contact a number of different locations.

24   It may contact the ground.  It can contact a number of

25   different spots along the way.

Michael Chambliss, M.D.                    72

1      Q.    But they would be consistent with his head

2   contacting the ground?

3             MR. BARONE:  Objection, calls for speculation,

4   assumes facts.

5             THE WITNESS:  There's no way for me to

6   specifically say the ground is what caused this head

7   injury.

8   BY MR. MURPHY:

9      Q.    Do you know anything about the rotational forces

10  that are present in highway speed rollover accidents?

11     A.    I'm not sure what you're referring to if I know

12  something about them.  I'm not -- I'm trying to get you to

13  clarify your question.

14     Q.    Do you have any knowledge regarding the rotational

15  forces that are present in highway speed rollover

16  accidents?

17     A.    Not the forces themselves, no.

18     Q.    What do you mean by that?

19     A.    I don't know the specific numbers of forces,

20  rotational forces that are associated with motor vehicle

21  collision or rollover accidents.  I don't have any direct

22  knowledge of that.

23     Q.    Outside of having specific knowledge of the number

24  of the specific amounts of forces, do you have any knowledge

25  as to whether the forces are significant in those types of

Michael Chambliss, M.D.                                73

1    accidents?

2             MR. BARONE:  Objection, it's an incomplete

3    hypothetical, lacks foundation.

4    BY MR. MURPHY:

5        Q.   Do you have any knowledge of the rotational forces

6    in the rollover accidents?

7             MR. BARONE:  Objection, lacks foundation, asked

8    and answered.

9             THE WITNESS:  What one can say is when you're

10   judging the degree of forces that produce certain types of

11   head injuries, you may be able to say that forces are

12   greater in some cases than in others, whether you can

13   quantify that amount of force associated with the motor

14   vehicle collision versus the amount of force associated with

15   blunt trauma in a homicide, it's difficult to say.  There's

16   no way for one to say, at least in my experience, it's so

17   much force associated with a motor vehicle collision versus

18   so much force associated with blunt head trauma in a

19   homicide.  You don't quantify it that way.

20       Q.   Going back to the pathological diagnoses, the

21   second item, blunt force injuries of the chest, which of

22   those two items would have been possible fatal injuries?

23            MR. BARONE:  Objection, as to form, lacks

24   foundation.

25   BY MR. MURPHY:

Michael Chambliss, M.D.                                    74

1        Q.    If either of them are.

2        A.    Actually, letter A can potentially result in an

3    individual's death.  If you have a fracture of the sternum,

4    even if it's the upper sternum, direct impact to the center

5    portion of your body, you may have an impact that either

6    directly or off slightly to the side of that direct impact

7    does strike your heart and by striking your heart, you can

8    get disruption of the heart rhythm, you may get a rupture of

9    the heart, you may get some impact there that could

10   potentially cause the individual's death.  Pulmonary

11   contusions are lungs with focal contusions, Letter B under

12   No. 2, are actually more of the, I would call, associated

13   injuries to common findings in the chest area, such as rib

14   fractures, injuries to the sternum.  These are -- unless

15   they're lacerated or large injuries to the lungs, they're

16   not commonly your direct cause of death or commonly seen as

17   far as the resulting in death.

18       Q.    In this case, did you note any injuries to

19   decedent's heart in relation to his fractured sternum which

20   could have lead to his death?

21       A.    He has hemorrhage over the front of the

22   pericardial sac, which I described in right after -- in some

23   of the photographs it's present, that there is some obvious

24   hemorrhage over the outer surface of the pericardial sac

25   associated with the fracture of the sternum.  The impact was

Michael Chambliss, M.D.                              75

1    significant enough to create soft tissue injury also has the

2    potential to result in the individual's death, but that's

3    about the best I could say for you.

4          Q.    How would that have occurred?

5                MR. BARONE:   Objection, lacks foundation.

6    Incomplete hypothetical.

7                THE WITNESS:   Direct impact to the chest area.

8    How it took place --

9    BY MR. MURPHY:

10         Q.    Maybe you are misunderstanding my question.

11         A.    Clarify.

12         Q.    How could the injury to the pericardial sac have

13    been related to the decedent's death?

14         A.    What I'm saying is the amount of force that

15    happened to the sternum by fracturing the sternum, directly

16    beneath the sternum or in the location of where the fracture

17    is, you have a collection of blood in the soft tissue under

18    that indicating the impact went not only on the skin, it

19    went deeper into the tissues right on the outside of the

20    heart.  It didn't tear the heart, but direct impact to the

21    heart can potentially cause death.

22         Q.    How would that occur?

23         A.    You can get a direct impact to the heart, it can

24    disrupt the electrical activity of the heart, it's commonly

25    seen in sports injuries.  If someone gets correctly hit in

Michael Chambliss, M.D.                                    76

1  the heart, they may become unconscious, go directly down.

2  Sometimes they'll die immediately.

3       Q.    Did you find any further evidence that that

4  occurred in this case?

5       A.    There's no way I could say that.  What you only

6  can say is this is a potentially fatal type of injury and

7  you include it under your cause of death.  There's no way I

8  can document arrythmia taking place on the heart.  There's

9  nothing I can say for that.

10      Q.    Do you have any opinion as we sit here today

11  regarding specific cause of this decedent's death?

12      A.    Again, it's a collection of head injury, neck

13  injury, chest injury.  It's all three of them together.

14      Q.    There's no way for you to determine or form an

15  opinion regarding which of those in particular it might have

16  been a cause of death?

17      A.    You can't separate them out.  In a motor vehicle

18  collision, you have -- unless you have one isolated injury

19  that is more significant than the others, there's no way to

20  separate out three potentially fatal type of injuries, you

21  group them together.

22      Q.    Specifically when you refer to the neck injuries,

23  which injuries were you referring to?

24      A.    Fracture of both locations in the cervical spine.

25  You've got an upper neck fracture, lower neck fracture.

Michael Chambliss, M.D.                                    77

1  Those are very common fractures we see in motor vehicle

2  collisions.

3       Q.    Of the things noted in your pathological

4  diagnoses, which of them are not related to the accident?

5       A.    Under pathological diagnoses, No. 3, 4 and 5 which

6  are all items of pathology not injury, I'll put it that way.

7  No. 3 refers to the pathology found in the heart as well as

8  the coronary arteries of the heart and the muscle of the

9  heart.  No. 4 is the kidney with its stones present inside

10  the collecting system of the kidney.  No. 5, there are some

11  scar tissue present in the chest area and upper abdomen.

12  I'm not sure exactly the cause of the scar tissue.

13       Q.    Do you have any information about how the decedent

14  was positioned at the time of the accident?

15            MR. BARONE:  Objection, it's vague.

16            THE WITNESS:  I'm not -- clarify your question.

17  BY MR. MURPHY:

18       Q.    Did you get any information from anyone regarding,

19  for instance, how the -- did you get any information from

20  anyone regarding how the decedent was positioned before or

21  after the accident occurred as he was in his vehicle?

22       A.    I couldn't tell you specifically that I did.  I'm

23  trying to answer your question in the proper way, which

24  means I don't independently remember someone telling me he's

25  positioned in the car a certain way or not.

Michael Chambliss, M.D.                                    78

1      Q.    From the marks that you saw on his body, are you

2  able to determine anything about how his seat belt was worn,

3  if it was?

4      A.    As I mentioned, you have an injury that could be

5  associated with a seat belt.  I have no abrasion that tells

6  me the seat belt was in place.  It doesn't have to create an

7  abrasion.  There's no way for me to determine the position

8  of how the individual is in the car just from looking at

9  these types of injuries.  Nothing is specific enough to tell

10  me he's positioned this way in the car or under the car or

11  outside the car.

12      Q.    Or he's wearing his seat belt?

13      A.    Or he's wearing his seat belt.

14      Q.    Are you aware of any marks or body -- are you

15  aware of any marks or injury to his body that occurred after

16  the accident during the removal and the transport of the

17  body?

18      A.    There's no mention of any injury, first of all.

19  Secondary, everything I see on the body itself could be

20  produced by the accident.  I see nothing that's commonly

21  associated with the removal process of an individual from an

22  accident.

23      Q.    Do you have any knowledge about how he was removed

24  from the vehicle?

25      A.    No.

Michael Chambliss, M.D.                    79

1      Q.    Did you determine there were any

2   possible -- other -- were you able to determine whether or

3   not there were any other possible causes of death other than

4   those associated with the motor vehicle accident?

5      A.    None whatsoever, no.

6      Q.    Did you have any contact with the decedent's

7   family?

8      A.    No.

9      Q.    Did you have any contact with the attorneys

10  representing any part any this case?

11     A.    Only, I believe your firm is the one who requested

12  the deposition.  That would be the only time I've been

13  contacted about this case.

14          MR. MURPHY:  I believe that's all the questions I

15  have.

16          MR. BARONE:  I have a couple quick questions.

17                    EXAMINATION

18  BY MR. BARONE:

19     Q.    Going backwards, what internal injury did you see

20  that could be consistent with seat belt use?

21     A.    The internal injuries could be a fracture of his

22  left clavicle.  Considering he's a driver, it would come

23  across the top of his left shoulder area, produce the

24  hemorrhage, also possibly produce a fracture on the

25  clavicle.  That's the harness or shoulder portion of the

seat belt.  As it directs down toward the center portion,

that's not likely to be the sternal type of fracture.

Usually you get shoulder and anything else would be down in

the pelvic area, you'll get abdominal injury or pelvic

injury, but I don't see anything else.  Only thing, left

shoulder.

Q.    Counsel asked you about a diffused axonal injury,

you said that was a possibility.  Is it fair to say you

can't state within a reasonable medical probability?

MR. MURPHY:  Calls for speculation, lacks

foundation.

THE WITNESS:  Yes.  That's a diagnosis made -- in

some cases, you can use special stains now to actually see

the axonal injuries.  But we're only looking at the degree

of impact to the scalp and skull, and there's no way to know

directly if you have axonal injury there or not.  It's our

judgment that that's a possibility.

BY MR. BARONE:

Q.    To state it in simple terms, because you didn't do

the other tests that you talked about, based on the tests

that you did do, there's no way to state within a reasonable

medical probability that he suffered a diffused axonal

injury; is that fair?

A.    That's fair.

MR. MURPHY:  Same objections.

Michael Chambliss, M.D.                                81

1  BY MR. BARONE:

2      Q.    Did you have an opportunity to review the death

3  certificate?

4      A.    Yes, not prior to coming to the deposition here,

5  but I did review it a week ago or so.

6      Q.    Did you have anything to do with the approval or

7  preparation of the death certificate?

8      A.    No.  What ends up happening is once I issue a form

9  as soon as we complete our autopsy, we give them a cause of

10 death form, meaning "them" is our deputy coroners and it

11 does not have to be Sarah Davis, it only has is to be one of

12 the deputy coroners.  They take the information we have on

13 our form for cause of death and produce a death

14 certificate.

15     Q.    I note that on the death certificate itself it has

16 a date of June 20, 2011 next to Sarah Davis.  My question

17 is:  Since you hadn't prepared the report by that time, was

18 this a verbal that was given to the folks who prepared the

19 death certificate?

20         MR. BARONE:  We'll mark that next in order, 13.

21             (Whereupon, Exhibit 13 was

22             marked for identification.)

23         THE WITNESS:  It would have been a verbal, but

24 also again, we do issue a form which is part of the

25 report -- part of the file that is utilized by the

Michael Chambliss, M.D.                                    82

1   pathologist upon completing that.  I noticed that the date I
2   signed the form was actually on the 13th.  I don't know the
3   difference between what took place from the 13th to the
4   20th.
5   BY MR. BARONE:
6        Q.    Does Sarah Davis still work for Fresno County?
7        A.    Yes.
8        Q.    Does she still work in this office?
9        A.    Yes.
10       Q.    She's a deputy coroner, what does that mean?
11       A.    She's a deputized or authorized investigator
12  appointed by the coroner to function in many of the aspects
13  of what the job has to do that he handles the administrative
14  aspect, she handles a lot of the investigative aspects.
15       Q.    Based on what you said before, unless it was a
16  homicide a Sarah Davis type person would go out to the
17  scene, document and photograph it?
18       A.    Yes.
19       Q.    And then contact the removal folks?
20       A.    Yes.
21       Q.    Again, Sarah Davis took all the scene photographs,
22  correct?
23       A.    Yes, she would have taken all the scene
24  photographs.  The only other people that would take
25  photographs are the CHP, California Highway Patrol

1   individuals.

2       Q.    Earlier we spent a little time on how many times

3   you were in court testifying.  When was the last time you

4   testified in a civil case, approximately?

5       A.    Approximately, I would say within this past year,

6   within the last six months.

7       Q.    What kind of case was that generally, motor

8   vehicle, slip and fall?

9       A.    It was a motor vehicle collision.

10      Q.    Do you remember what county or court it was in?

11      A.    It had to be in this county.  I haven't done any

12  additional testifying outside of this county.

13      Q.    Have you ever failed to qualify as an expert

14  witness in court?

15      A.    No.

16          MR. BARONE:  I don't have anything else.

17                FURTHER EXAMINATION

18  BY MR. MURPHY:

19      Q.    A couple more.  Did you form any opinion regarding

20  the precise time at which the decedent passed away?

21      A.    No.  There's no way for me to know the precise

22  time.

23      Q.    Based on the injuries that you documented, do you

24  have any opinion as to whether or not he survived for any

25  appreciable amount of time after the accident?

Michael Chambliss, M.D.                                    84

1           MR. BARONE:  Objection, vague and form.

2           THE WITNESS:  The way I sign death certificates --

3  in this particular case it was signed with the injuries for

4  seconds, so head, neck and chest injuries duration survival

5  would be seconds and I leave it at that.  These injuries to

6  me are within a range of seconds.  They could be immediate.

7  There's no way for me to know that.  They are survivable

8  only for seconds.

9  BY MR. MURPHY:

10      Q.   The injuries you documented, how long would

11  someone have been able to survive them?

12      A.   That's what I -- I was indicating that there's no

13  way for me to extend out beyond the point of saying these

14  are likely to be in a range of seconds.  The head injury,

15  neck, chest injuries and in total would result in this

16  individual in this type of accident in a rollover accident

17  allowing him to survive only for seconds.

18      Q.   You didn't note any skull fractures, correct?

19      A.   That's correct.

20      Q.   How did you determine there was no skull

21  fractures?

22      A.   By actually removing all the soft tissues around

23  the skull and removing the skull and taking off the dura.

24  By removing the dura from the inside of the skull, we're

25  able to examine what we call the floor of the skull.  We can

1    judge if there's any fractures there by looking over the

2    entire outer portion of the skull.  We can determine if

3    there's any fractures of the outer skull.

4         Q.    If I asked you to, would you be able to identify

5    the fractures of the cervical spines in the photographs that

6    are in front of you?

7         A.    Not specifically.  Again, you would

8    have -- meaning an individual would have to take away all of

9    the hemorrhagic areas and focus entirely on one little line,

10   which would be difficult to specifically say that's a

11   fracture.

12        Q.    What about the sternum fracture?

13        A.    I could look and see if I could tell.

14        Q.    That's my last question if you can find it.

15        A.    I couldn't tell you.  Only thing I could say is

16   it's present, I documented photographically.  For me to show

17   you specifically this is a fracture, you'd have to take my

18   experience and my opinion about it.  It's sometimes hard to

19   show.

20        Q.    You couldn't point it out in any of the

21   photographs?

22        A.    I could point it to you, but to your

23   satisfaction -- it may not be to your satisfaction.  You'd

24   have to really blow it up, and if you blow up some of these

25   photographs, you may actually be able to see the line that

Michael Chambliss, M.D.                                    **86**

1  creates the fractures.  At this level, you may not be able

2  to.  You enlarge a photograph of some of these areas that

3  are hemorrhagic, I may have cleaned away the hemorrhage

4  enough to specifically show the fracture line, but it needs

5  to be enlarged.

6      Q.    Based on the photographs you have in front of you,

7  you don't think you could identify it?

8      A.    Not from just looking at an area.  That's why I

9  base it upon, this is what I saw visually.  I moved the

10  spine, I could see it move.  You can't do that on a one

11  dimension photo.  You may be able to get a little more

12  clarity by enlarging the photograph, which is done in court.

13  We've done this a number of times in court and you can

14  actually see the fracture.

15          MR. MURPHY:  Those are all the questions I have.

16                  FURTHER EXAMINATION

17  BY MR. BARONE:

18      Q.    If you don't mind, how were those photographs

19  saved, are they digital?

20      A.    Yes.

21      Q.    Are they on a disk somewhere?

22      A.    We keep them in the system and it takes less than

23  a few minutes to put them on a disk.

24      Q.    Would it be possible if you could have a couple

25  disks made for us?

Michael Chambliss, M.D.                                    87

1        A.    Sure.

2        Q.    At our expense?

3        A.    Generally that's how it's done.  When we have them

4    prepared, it's a charge to have the photos done, but it's on

5    a disk.  We give you a disk.

6              MR. MURPHY:  I'll send them to you.

7              THE WITNESS:  We can do it now.

8              MR. BARONE:  I would love you to have it if you

9    could do it.

10             THE WITNESS:  No problem.

11             MR. BARONE:  Off the record.

12                  (Discussion held off the record.)

13             MR. MURPHY:  I'll stipulate to relieve the court

14   reporter of her duties under the Code of Civil Procedure

15   regarding the maintenance of the transcript.  Doctor, you'll

16   receive a copy of the transcript.  It will come along with a

17   self-addressed envelope with my address on it.  You'll have

18   the opportunity to review it, make any changes as you see

19   fit.  Any changes that you make can be commented on down the

20   line at trial.  Once you've made those changes, sign it

21   under penalty of perjury and you'll send it back to me.  My

22   office will maintain the transcript.  If we don't get it

23   within 30 days of the time it's sent to you, a copy can be

24   used -- an unsigned version can be used for all purposes

25   including trial.  If the original is for whatever reason

Michael Chambliss, M.D.                          88

1  lost, misplaced or unavailable, a copy can be used for all

2  purposes.

3          MR. BARONE:  And you'll produce the original at

4  trial and any other time with reasonable notice?

5          MR. MURPHY:  Yes.

6          MR. BARONE:  Can we also stipulate to use a copy

7  before it's fully signed and corrected for purposes of any

8  court matter before the original is signed and corrected?

9          MR. BARONE:  Yes.

10              (Whereupon, the proceedings

11               concluded at 5:15 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

89

STATE OF CALIFORNIA )
                    )  SS.
COUNTY OF FRESNO    )

            I, MICHAEL CHAMBLISS, M.D., do hereby certify:

            That I have read the foregoing deposition;

            That I have made such changes in form and/or

substance to the within deposition as might be necessary to

render the same true and correct;

            That having made such changes thereon, I hereby

subscribe my name to the deposition.

            I declare under penalty of perjury that the

foregoing is true and correct.

            Execute this _____ day of _____,

2013, at _____, California.

                         _____

                                   MICHAEL CHAMBLISS, M.D.

90

REPORTER'S CERTIFICATION

I, Jennifer W. Harmon, a Certified Shorthand Reporter in and for the State of California, holding Certificate No. 11770, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewritten form under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name on ___September 3rd___, 2013.


JENNIFER W. HARMON, CSR No. 11770

Edwards, Lupi  vs.
Ford Motor Company

Michael Chambliss, M.D.
August 27, 2013

## $

**$101 (1)**
53:24

## 1

**1 (15)**
37:11,14,18,24;38:14;40:19;
42:16;50:9,10,17;52:21;54:7;
68:25;70:5,12
**1,000 (2)**
10:2,3
**1:40 (1)**
4:1
**10 (17)**
20:25;21:1,20;22:14,20,23,
24;23:4;44:3,4;45:12;46:1;
49:19;60:11;61:10,13;63:21
**100 (4)**
11:4,5,11,18
**10-43 (1)**
45:5
**11 (5)**
21:23,24;22:14,21,22
**11-1 (1)**
24:6
**12 (8)**
34:15,21,21,25;36:15;52:1,4,
21
**13 (3)**
29:16;81:20,21
**13th (4)**
29:25;37:10;82:2,3
**15 (2)**
35:4,17
**195 (1)**
40:4
**1983 (3)**
7:24,24;8:1
**1984 (4)**
6:12;7:11;8:1,1
**1985 (3)**
6:12,13;7:12
**1991 (2)**
6:13,15

## 2

**2 (10)**
18:10;48:8;49:18;51:6,15;
54:8,24;61:2;65:19;74:12
**20 (2)**
63:21;81:16
**200 (1)**
10:18
**2003 (3)**
6:2;7:6;10:14
**2011 (6)**
29:16;35:4,4,18;37:10;81:16
**2055 (1)**
39:23

**208 (1)**
40:8
**20th (1)**
82:4
**22 (1)**
60:12
**223 (1)**
40:8
**29 (2)**
10:3;35:3
**2cm (1)**
40:10

## 3

**3 (8)**
18:21;43:6;52:14;54:9;60:20;
61:5;77:5,7
**30 (1)**
87:23
**3333 (1)**
5:6
**361 (1)**
40:21

## 4

**4 (5)**
50:24;53:19;54:11;77:5,9
**41 (2)**
61:9,14
**42 (2)**
61:14,16
**43 (3)**
44:4,18;45:4

## 5

**5 (11)**
36:18;54:13,18,19,23;55:5,
11;68:9,24;77:5,10
**5,000 (2)**
9:14;16:18
**5:15 (1)**
88:11
**56 (1)**
52:1

## 6

**6 (5)**
54:15;55:2,6,19,22
**610 (2)**
39:12;42:13
**615 (1)**
39:6
**66 (3)**
45:12;46:2,10
**67 (1)**
46:11
**685 (1)**
39:5

## 7

**7 (2)**
13:24;14:1
**7,000 (1)**
16:14
**702 (1)**
5:7
**7th (1)**
38:14

## 8

**8 (4)**
14:16,19;16:4;18:21
**800 (1)**
16:22

## 9

**9 (4)**
14:18,19,23;17:6
**9-A (5)**
17:24;18:12,15,21;56:2

## A

**abbreviated (3)**
38:7,13;55:5
**abbreviation (3)**
38:21;55:1,7
**abdomen (1)**
77:11
**abdominal (2)**
67:16;80:4
**ability (1)**
59:20
**able (19)**
9:23,24;12:5;13:5;15:21;
36:10;65:20;66:5,12;70:9;
73:11;78:2;79:2;84:11,25;85:4,
25;86:1,11
**above (5)**
37:25;40:9,24;45:14;61:10
**abrasion (16)**
42:8;49:16;50:14,21;51:5;
54:5,11;57:9;61:4,12;64:9,12,
13;65:10;78:5,7
**abrasions (3)**
51:19;61:3;62:8
**abrasion-wise (1)**
62:7
**Absolutely (3)**
12:9;25:2;48:7
**absorb (1)**
69:15
**accident (29)**
9:17;11:8,22;12:23;17:1,3;
22:7;23:24;24:12;25:5,7,14;
26:2;27:4;29:17,22;64:1;68:22;
71:22;77:4,14,21;78:16,20,22;
79:4;83:25;84:16,16

**accidental (1)**
9:7
**accidents (22)**
9:25;10:6,8,9,10,13,16,21,23;
11:15,17;26:9;27:3;59:22,23;
64:7;67:4;72:10,16,21;73:1,6
**according (2)**
17:13;68:17
**across (2)**
65:4;79:23
**action (1)**
4:12
**activity (1)**
75:24
**actual (2)**
49:3;55:25
**actually (28)**
5:13;8:24;12:4;16:9;18:4;
22:20;30:25;43:9;45:12,22;
46:9;47:21;50:3;60:11,21;
61:14;62:22;65:22,24;66:2,3;
74:2,12;80:13;82:2;84:22;
85:25;86:14
**added (1)**
36:20
**additional (5)**
31:9;40:13;41:24;52:2;83:12
**additionally (1)**
15:1
**address (4)**
5:4,6,7;87:17
**adenopathy (1)**
40:6
**adhesed (1)**
40:3
**adhesions (3)**
38:3,6;39:6
**administrative (1)**
82:13
**adrenals (1)**
40:23
**affects (1)**
53:22
**afternoon (1)**
29:22
**afterwards (1)**
35:14
**again (12)**
12:3;25:15;28:25;46:6;47:13;
54:18;58:8;63:14;76:12;81:24;
82:21;85:7
**against (3)**
4:13;12:22;49:5
**age (1)**
29:3
**ago (3)**
19:17,19;81:5
**ahead (3)**
13:23;60:17;61:16
**airway (1)**
67:23
**alarm (1)**
36:2

Edwards, Lupi  vs.
Ford Motor Company

Michael Chambliss, M.D.
August 27, 2013

**alcohol (1)**
68:21
**allowed (3)**
11:22,25;12:10
**allowing (1)**
84:17
**almost (3)**
31:22;59:22;64:11
**along (6)**
50:4;55:22;57:20;58:11;
71:25;87:16
**always (1)**
52:12
**amazing (1)**
33:22
**American (1)**
5:6
**amount (18)**
10:12;33:12;38:1;40:22;
46:14,20;51:18;58:15;62:24;
63:4,10,22;66:18,25;73:13,14;
75:14;83:25
**amounts (1)**
72:24
**analysis (2)**
68:13;70:20
**anatomical (3)**
7:21,23;8:5
**angled (1)**
65:5
**ankle (1)**
54:4
**answered (1)**
73:8
**anterior (1)**
39:19
**anymore (1)**
13:2
**apex (1)**
39:17
**apnea (1)**
67:22
**appear (3)**
22:6,16,19
**appearance (2)**
30:16;41:5
**appendix (1)**
38:6
**apply (1)**
4:22
**appointed (1)**
82:12
**appreciable (1)**
83:25
**approval (1)**
81:6
**approximately (3)**
6:19;83:4,5
**area (42)**
44:18,20,20;45:14,24;49:19,
21;50:2,3,5,9;51:6;53:10,14;
55:23;56:24,25;57:7,7,13;58:3,
8,8,10,24;60:12,16,22,24;62:25;

63:14;64:4,17;65:10,25;67:16;
74:13;75:7;77:11;79:23;80:4;
86:8
**areas (9)**
39:15;44:11,23;48:10;49:15;
52:16;71:8;85:9;86:2
**arm (1)**
57:7
**arms (3)**
30:17;61:5;67:16
**around (10)**
38:4,5;40:18,19;45:10;57:6;
64:15,18;66:3;84:22
**arranged (1)**
24:22
**arrived (1)**
61:19
**arrythmia (1)**
76:8
**arteries (3)**
39:18;52:17;77:8
**artery (1)**
39:20
**arthritic (1)**
38:17
**aspect (1)**
82:14
**aspects (2)**
82:12,14
**assigned (1)**
22:11
**assist (2)**
33:4,6
**assistant (3)**
23:13;32:20,22
**assisting (2)**
32:18;33:1
**associated (21)**
42:20;43:7,11;54:20;57:24,
25;58:17;59:10;65:9;70:12,16;
72:20;73:13,14,17,18;74:12,25;
78:5,21;79:4
**Associates (1)**
6:16
**association (1)**
44:11
**assume (1)**
4:17
**assumes (1)**
72:4
**athero (1)**
39:22
**A-t-h-e-r-o (1)**
39:22
**atherosclerosis (1)**
39:22
**atria (1)**
39:12
**attach (3)**
13:23;14:16,17
**attached (4)**
17:6;18:12;40:2,22
**attaching (1)**

34:21
**attended (1)**
7:17
**attention (1)**
56:4
**attorney (2)**
13:4;15:22
**attorneys (2)**
12:13;79:9
**Attorney's (2)**
12:12,21
**authorized (1)**
82:11
**autolized (1)**
40:23
**automatic (1)**
27:1
**automobile (6)**
9:17,25;10:5,9,10;11:22
**autopsies (9)**
5:11;8:17;9:14;10:18;12:6;
16:18;27:2,18;29:22
**autopsy (40)**
5:15;18:5,17,18,19;19:2,18;
21:18,20;23:2,13;24:22;26:21,
24,25;27:6,9;28:7,8,10,11;
29:15;31:13;32:7,20,22;33:25;
35:7;36:20,23,25;37:1,9;41:16;
52:11;53:1;54:22;56:5;69:21;
81:9
**available (3)**
28:15,17;33:13
**Avenue (1)**
5:6
**aware (2)**
78:14,15
**away (7)**
27:4;35:15;36:11;62:5;83:20;
85:8;86:3
**axonal (10)**
70:23;71:12,13,14,16,17;
80:7,14,16,22

**B**

**baby (1)**
27:2
**back (23)**
13:6;15:15;17:16;24:10;
30:19,20;34:11,12,17;36:7;
40:19;44:7;47:4,9;53:1;55:25;
56:1;59:19;60:2;62:16;64:8;
73:20;87:21
**background (2)**
7:14,15
**backlog (1)**
35:23
**backwards (1)**
79:19
**BARONE (43)**
17:9,14;20:10;21:6,9,14;22:9;
34:6;44:3;46:17;48:6,8,12,19;
51:8,20;54:23;55:2;59:14,16,

18;63:6;66:21;72:3;73:2,7,23;
75:5;77:15;79:16,18;80:18;
81:1,20;82:5;83:16;84:1;86:17;
87:8,11;88:3,6,9
**base (5)**
8:21;31:15;39:17;44:19;86:9
**based (11)**
5:22;31:24;36:8,9,9;66:5,12;
80:20;82:15;83:23;86:6
**Basically (1)**
29:21
**basis (1)**
27:7
**became (3)**
6:22;7:2,4
**become (1)**
76:1
**becomes (1)**
15:14
**begin (1)**
53:8
**below (4)**
47:16;54:6,24;60:25
**belt (13)**
64:22;65:6,8,9,12,17;78:2,5,6,
12,13;79:20;80:1
**Beneath (8)**
39:4;41:14,24;42:2,7;54:5;
62:22;75:16
**best (1)**
75:3
**better (1)**
61:14
**beyond (1)**
84:13
**BFI (1)**
42:1
**biliary (1)**
39:25
**biomechanics (1)**
16:24
**bit (1)**
63:15
**bite (1)**
39:1
**black (4)**
44:25;53:13,24;60:17
**bladder (2)**
40:16,16
**bleed (1)**
63:15
**bleeding (1)**
57:25
**BLK (1)**
53:12
**blood (14)**
28:16,18;31:8,9;41:16;53:14,
14;62:22,25;63:3,15,17;64:5;
75:17
**blow (2)**
85:24,24
**blue (1)**
53:16

**blue/black (1)**
53:17
**blue/white (1)**
53:17
**blue-gloved (1)**
22:25
**blunt (10)**
42:1,9;58:15;68:25;69:3;
70:5;71:11;73:15,18,21
**BM (1)**
39:1
**board (2)**
8:4,5
**bodies (2)**
10:5,8
**body (17)**
29:9;30:9,14;31:2;53:20;
57:3,11;62:1;64:22;67:9,13;
74:5;78:1,14,15,17,19
**boggy (5)**
53:10;58:8;62:16,20;63:1
**bone (1)**
38:24
**both (14)**
7:21;16:21;19:9;32:15;38:12;
40:8,14;41:2;58:10;67:10,12;
68:5;69:22;76:24
**bottom (4)**
30:17;40:20;49:21;50:17
**brain (25)**
8:19;9:6,7;41:11,12;47:10,19,
21,24;48:1,2;68:1,5,6;70:17,20,
23;71:5,5,6,7,9,10,13,14
**brain/scalp/skull (1)**
41:3
**brake (1)**
34:7
**bread (1)**
47:25
**break (1)**
34:13
**brief (3)**
7:13;34:14;36:4
**briefs (1)**
53:17
**bring (4)**
13:25;14:5,8;58:4
**brought (9)**
12:22;14:11,13,17,22;15:25;
16:2,5;65:24
**brown (1)**
61:11
**bruise (1)**
58:11
**bruises (1)**
69:11
**bruising (2)**
65:10;69:16
**BS (1)**
7:17
**Building (1)**
5:6
**burn (1)**

64:12
**business (1)**
5:7

**C**

**C3 (6)**
38:16;41:2;42:4;65:21;66:3;
70:13
**C7 (2)**
38:13;65:20
**C7-T1 (3)**
41:1;42:3;43:18
**cage (2)**
69:13,13
**calcification (1)**
39:18
**calcifications (2)**
39:21;40:14
**California (3)**
5:7;23:23;82:25
**call (12)**
9:1;15:12,16;23:18;34:11;
47:25;63:1;64:14;68:6;71:13;
74:12;84:25
**called (1)**
15:16
**calls (8)**
26:1,4;46:17;51:20;63:6;
66:21;72:3;80:10
**calyces (1)**
40:14
**came (2)**
6:15;33:21
**can (67)**
4:25;5:4;6:7;10:25;18:2,13;
19:5,6;22:25;26:14,15,18;30:5;
31:21;33:9;34:4,5,10,12;35:24;
43:24;45:22;48:22;49:14;52:8;
53:6;58:2;59:14;60:9,12,15;
63:2,15;64:2,21;67:13,15,15,21,
23;69:20,22;70:16,18;71:23,24;
73:9,12;74:2,7;75:21,23,23;
76:6,8,9;80:13;84:25;85:2,14;
86:13;87:7,19,23,24;88:1,6
**canal (1)**
66:17
**capital (1)**
39:1
**car (10)**
11:7;27:14,25;28:3,3;77:25;
78:8,10,10,11
**card (3)**
23:1;45:14;61:10
**cardiomegaly (1)**
42:13
**cards (1)**
53:24
**career (3)**
8:13;9:13;10:3
**cartilages (4)**
39:9,10;67:20,23
**case (66)**

5:18;9:4;12:2;13:2,9,11,13,
20,21;14:25;15:8,15;17:25;
18:1,10,19;19:2,6;20:16;22:11;
23:14,15,18,19,20,21;24:13,21,
23;25:3,10,16;26:17,20,22;27:8,
21;29:1,8,11,13;31:9,17;32:23,
24;33:2,18,20,21;36:12,14;
37:2;55:13;56:21;59:2;63:3;
68:14;70:21;71:18;74:18;76:4;
79:10,13;83:4,7;84:3
**case-by-case (2)**
27:7,18
**caseload (2)**
35:9;36:10
**cases (39)**
7:5;8:19,19;10:11,15;11:14,
18;12:8,9,11,12,19,24;13:4,6,7;
16:22;24:10,16;26:8,11,13;
27:1,3,17,22;28:1,13;29:1,24;
30:2;32:17;35:10,19,23,24;
59:21;73:12;80:13
**categories (1)**
41:14
**categorizing (1)**
57:18
**category (10)**
38:19,20;39:4,6,11,23;40:4,7,
25;41:3
**cause (27)**
5:12,16;9:7;28:4,21;41:19;
46:15;58:17;63:5;66:19;70:1,
10,12,13,14,15,16,19;74:10,16;
75:21;76:7,11,16;77:12;81:9,13
**caused (4)**
51:19;63:12;65:12;72:6
**causes (2)**
9:21;79:3
**cavities (2)**
38:3,19
**cavity (4)**
38:4;58:24,24;59:6
**CD (1)**
15:5
**Center (4)**
7:22;71:8;74:4;80:1
**centimeter (1)**
40:11
**centimeters (1)**
40:10
**cerebellum (1)**
71:10
**certain (9)**
8:19;26:8;27:1;47:1;67:9,13,
24;73:10;77:25
**certificate (7)**
18:1,10;81:3,7,14,15,19
**certificates (1)**
84:2
**certification (1)**
8:7
**Certified (4)**
4:6;8:4,5;16:14
**cervical (15)**

38:14,17,22,23;42:3,22;
45:15,23;55:16;59:8;65:20,25;
70:15;76:24;85:5
**CHAMBLISS (4)**
4:4,15,15;21:6
**C-h-a-m-b-l-i-s-s (1)**
4:16
**chance (2)**
14:4;22:13
**change (2)**
6:3;36:3
**changed (1)**
52:6
**changes (5)**
38:17;71:7;87:18,19,20
**characterized (1)**
58:6
**charge (1)**
87:4
**charges (1)**
12:22
**check (1)**
33:17
**checked (1)**
30:9
**cheek (10)**
42:8;49:3,11,12,17,23,25;
50:3;54:12;58:9
**chest (14)**
30:17;41:21;42:9;66:2;67:15;
69:4;70:2;73:21;74:13;75:7;
76:13;77:11;84:4,15
**Chicago (4)**
6:10,10;7:11,21
**chief (1)**
16:15
**CHP (1)**
82:25
**circle (12)**
38:4,5;44:23;45:24;48:12;
49:14;50:5;51:5,12;60:17;61:8,
16
**circled (1)**
60:24
**circumcised (3)**
53:8,9;54:24
**circumstance (1)**
59:4
**circumstances (5)**
23:24;26:14;27:5,11,12
**civil (9)**
12:14,15,24;13:2,6,11;16:21;
83:4;87:14
**clarification (2)**
52:15;57:5
**clarify (3)**
72:13;75:11;77:16
**clarity (1)**
86:12
**CLAV (1)**
38:13
**clavicle (14)**
42:18;44:12,20;54:9;58:12,

18,21,23,25;59:6,9;65:8;79:22,
25
**clavicle/R (1)**
54:9
**clavicles (10)**
38:13,22;41:2;42:18,21;43:9,
11;45:6;65:3;67:14
**cleaned (1)**
86:3
**clearer (1)**
48:25
**clearly (3)**
43:9,13;49:13
**clinical (3)**
7:21,23;8:6
**close (5)**
10:2,2,3;53:3;59:11
**closely (1)**
59:10
**clothed (1)**
29:9
**clothes (2)**
29:6;53:15
**clothing (7)**
29:2;30:10,10,13;53:17,18,23
**COD (1)**
41:19
**Code (1)**
87:14
**collapsed (1)**
59:1
**collect (1)**
29:12
**collecting (2)**
64:5;77:10
**collection (3)**
62:21;75:17;76:12
**collision (9)**
23:22;64:1;66:24;67:10;
72:21;73:14,17;76:18;83:9
**collision-driver (1)**
41:23
**collisions (4)**
63:24;64:3;67:1;77:2
**column (3)**
41:17,19,24
**columns (1)**
41:24
**coming (7)**
7:6;19:12,16;20:19;26:19;
27:14;81:4
**commented (1)**
87:19
**common (7)**
9:19;10:16;66:24;67:1,4;
74:13;77:1
**commonly (7)**
67:9,13,17;74:16,16;75:24;
78:20
**Community (1)**
6:16
**Company (1)**
4:12

**compartment (1)**
65:16
**compel (1)**
52:7
**complete (6)**
26:18;28:10;29:10;36:9;
52:19;81:9
**completed (8)**
7:15,18;19:7;35:4,17;36:8,25;
55:18
**completely (1)**
30:9
**completing (4)**
7:17,19;19:2;82:1
**completion (3)**
28:20;37:8;40:19
**complications (1)**
59:2
**complies (10)**
45:1,25;49:18;50:8,11;51:14,
17;60:21;61:9;17
**compressed (1)**
49:5
**compression (1)**
49:2
**compromised (1)**
67:25
**computer (6)**
15:7,9,17,24;19:5,6
**computerized (1)**
15:4
**concerning (1)**
11:6
**concluded (1)**
88:11
**conclusion (1)**
68:19
**conclusions (1)**
11:23
**condition (1)**
71:11
**conditions (1)**
69:24
**conducted (2)**
29:15;35:7
**conducting (3)**
19:22;28:8,23
**confused (1)**
17:12
**congested (2)**
39:23;40:15
**congestion/edema (1)**
39:8
**conjunction (2)**
20:15;66:7
**Connect (1)**
50:9
**connection (2)**
20:4;22:3
**consider (5)**
10:4;56:20;57:1,16;58:19
**considered (3)**
5:16;15:13;70:7

**Considering (1)**
79:22
**consistent (4)**
64:9;71:21;72:1;79:20
**consult (1)**
9:2
**consultant (2)**
8:20;9:10
**consultations (1)**
8:17
**contact (9)**
23:17;24:1;25:1;71:23,24,24;
79:6,9;82:19
**contacted (2)**
25:16;79:13
**contacting (2)**
71:22;72:2
**contain (1)**
69:20
**contained (3)**
15:23,24;62:14
**contains (2)**
40:16;69:18
**continue (2)**
33:9;53:4
**contract (3)**
19:3;24:1,4
**contractor (1)**
7:2
**contracts (1)**
24:9
**contributed (1)**
68:21
**contusion (5)**
60:3;62:16,20,22;63:13
**contusions (7)**
39:7,7;42:11;62:8;69:7;
74:11,11
**Cook (4)**
6:9;7:10;8:2,23
**copied (1)**
49:1
**copies (2)**
14:24;34:4
**copy (10)**
14:13;16:4;17:18;21:9;34:25;
49:13;87:16,23;88:1,6
**cord (4)**
66:6,9,15,15
**corner (3)**
37:11,14;52:21
**coronal (1)**
47:25
**coronary (4)**
39:17,20;52:17;77:8
**coroner (16)**
5:17,19;7:4,5;18:5,8;19:8,10;
22:11,17;24:17,17;27:16;30:8;
82:10,12
**coroners (4)**
25:25;26:1;81:10,12
**Coroner's (18)**
5:2,9;6:1;7:3,7;14:25;16:15;

17:19;18:8,9,18;19:21;22:3;
23:6,10;24:9,10;61:20
**corrected (2)**
88:7,8
**correction (1)**
56:9
**corrections (1)**
19:5
**correctly (2)**
56:17;75:25
**corticocysts (2)**
40:9,11
**Counsel (1)**
80:7
**counties (1)**
7:3
**County (22)**
5:2,14,19;6:9,15,23,23;7:7,
10;8:2,23;9:1,3;10:14;13:3;
15:20;18:18;36:5;82:6;83:10,
11,12
**couple (6)**
42:15;55:12;56:14;79:16;
83:19;86:24
**course (7)**
4:19,22;8:13;32:2,7;36:21;
68:11
**court (16)**
4:21;11:6,15,17,20,25;12:4,8,
9;83:3,10,14;86:12,13;87:13;
88:8
**cover (1)**
17:25
**create (4)**
59:1;62:25;75:1;78:6
**creates (1)**
86:1
**criminal (2)**
13:12;16:21
**CS (2)**
47:19,20
**C-shaped (1)**
50:21
**CT (1)**
59:20
**CTs (1)**
59:18
**curious (1)**
52:6
**current (2)**
13:16,18
**currently (1)**
5:1
**curriculum (3)**
14:13;16:5,7
**cut (16)**
40:5,10,11,15;41:11;47:4,6,6,
20,21;48:2,4,5;68:6;71:6,7
**CV (1)**
16:3

**D**

Edwards, Lupi vs.
Ford Motor Company

Michael Chambliss, M.D.
August 27, 2013

**dark (1)**
44:10
**date (4)**
36:7;37:10;81:16;82:1
**Davis (12)**
22:9,11,23;23:13,17;24:11;
30:8;81:11,16;82:6,16,21
**Davis' (1)**
23:16
**day (9)**
24:15,20;29:17,23,25;30:3;
32:17,21;35:20
**days (1)**
87:23
**death (54)**
5:12,12,17;9:19,21;17:20;
20:5;22:4,18;23:11;25:23,24;
26:3,3;28:5,5,21,22;41:20;
57:20,20,21;58:1,2,4,16,17;
70:1,10,13,14,15,17,19;74:3,10,
16,17,20;75:2,13,21;76:7,11,16;
79:3;81:2,7,10,13,13,15,19;84:2
**deaths (5)**
9:20;16:14;26:4,10;27:2
**debris (1)**
62:15
**decedent (6)**
30:6;61:19;67:4;77:13,20;
83:20
**decedent's (9)**
59:5;61:4;62:1;70:10;71:21;
74:19;75:13;76:11;79:6
**deep (3)**
31:10;60:3;62:16
**deeper (4)**
62:6,14;63:23;75:19
**deference (1)**
40:18
**definitely (1)**
11:5
**definition (1)**
57:23
**degree (8)**
62:5,5;63:20;67:16,25;71:18;
73:10;80:14
**delay (3)**
35:6,16,18
**department (1)**
15:20
**depends (6)**
28:25;29:23;33:11;58:23;
59:4;63:14
**depicted (1)**
50:18
**deposed (1)**
4:17
**deposition (8)**
13:24;19:13,16;20:20;36:3,5;
79:12;81:4
**depositions (1)**
11:16
**depth (3)**
57:14;62:3;66:10

**deputized (1)**
82:11
**deputy (15)**
6:13,24;16:14;18:8;19:7;
22:11;24:16,17;25:25;26:1;
27:16;30:8;81:10,12;82:10
**descending/middle (1)**
39:19
**describe (7)**
6:7;46:7;50:1,20;52:24;
62:19;71:1
**described (6)**
40:23;50:23;53:10;61:12;
68:24;74:22
**describing (2)**
30:17;53:16
**description (3)**
7:13;53:9,22
**determination (1)**
5:14
**determine (19)**
5:12;13:6;26:6,20;28:22;
59:24;65:20;66:6,13;68:4;70:9,
11;76:14;78:2,7;79:1,2;84:20;
85:2
**determined (2)**
29:25;70:1
**determines (1)**
26:24
**determining (2)**
28:4;29:7
**diagnoses (7)**
68:23;69:17,22;70:4;73:20;
77:4,5
**Diagnosis (4)**
52:3,8,14;80:12
**diagram (9)**
33:19,20,23,24,25;34:2;
36:21,21;53:2
**diagrams (1)**
32:6
**diaphragm (1)**
40:1
**dictate (5)**
19:2;32:12;36:7,11,11
**dictated (10)**
18:19;31:19;35:3,8,10,14,15,
17,21;43:4
**dictation (8)**
19:4;31:22,24;32:8,9,14,16;
36:7
**die (1)**
76:2
**difference (1)**
82:3
**different (6)**
7:5;28:6;54:6;55:3;71:23,25
**difficult (5)**
9:18;13:8;60:14;73:15;85:10
**difficulty (1)**
55:6
**diffused (6)**
70:23;71:13,15,17;80:7,22

**digital (1)**
86:19
**dilated (1)**
40:12
**dimension (1)**
86:11
**dimensions (2)**
51:3;65:16
**direct (8)**
66:15;72:21;74:4,6,16;75:7,
20,23
**direction (9)**
46:15,22,23;51:19;63:5,9,21;
66:19,25
**directionality (1)**
64:6
**directly (9)**
15:17;36:13;44:7;53:2;71:8;
74:6;75:15;76:1;80:16
**directs (1)**
80:1
**discoloration (1)**
62:23
**discuss (3)**
26:20;27:15;34:24
**discussed (9)**
14:8;24:21;50:6;57:8;64:8;
69:1,4,6,18
**discussing (3)**
25:21;27:5,9
**Discussion (3)**
17:15;67:12;87:12
**disk (4)**
86:21,23;87:5,5
**disks (1)**
86:25
**dislodge (1)**
59:3
**disposition (1)**
26:6
**disrupt (2)**
59:6;75:24
**disruption (2)**
62:14;74:8
**disrupts (1)**
58:25
**distant (1)**
59:8
**District (3)**
12:12,20;13:4
**DNA (1)**
31:11
**doctor (4)**
27:16;32:21;34:19;87:15
**doctors (1)**
27:16
**document (11)**
14:6;16:13;18:16;26:13;
28:18;29:2;31:3,4,6;76:8;82:17
**documentation (3)**
15:12;28:11;30:22
**documented (13)**
30:10;45:10;55:21;58:5;61:4;

66:20;67:3;69:3,7;70:5;83:23;
84:10;85:16
**documenting (3)**
30:15;31:12,14
**documents (9)**
13:25;14:5,8,11,17,22;15:25;
17:9,12
**done (21)**
5:23;11:14;12:7;19:6,9;
26:17;27:10;28:11,12;29:1,20;
30:1;34:1;47:22;68:10,15;
83:11;86:12,13;87:3,4
**door (2)**
11:13;36:2
**down (12)**
33:8;35:24;36:25;37:9,12;
48:1,21;71:8;76:1;80:1,3;87:19
**Dr (5)**
5:19;18:5;21:6;24:18,19
**draw (1)**
31:7
**driver (2)**
65:16;79:22
**drivers (2)**
67:11,12
**driving (2)**
27:24;28:3
**drugs (1)**
68:21
**due (2)**
39:10;71:18
**DUI (1)**
12:21
**duly (1)**
4:5
**dura (2)**
84:23,24
**duration (1)**
84:4
**during (10)**
29:5;31:7;32:2,7;41:15;
44:16;52:25;61:25;71:22;78:16
**duties (1)**
87:14

**E**

**ear (1)**
49:21
**earlier (6)**
20:4;51:11;57:8;68:10;69:18;
83:2
**easier (1)**
32:11
**easily (1)**
63:15
**East (1)**
5:6
**edemas (1)**
63:1
**EDH (1)**
47:13
**educational (2)**

Edwards, Lupi  vs.
Ford Motor Company

Michael Chambliss, M.D.
August 27, 2013

7:14,15
Edwards (7)
 4:13;17:20;30:11;37:25;
 44:19;56:24;58:6
Edwards' (1)
 61:11
effects (1)
 30:11
eighth (1)
 18:16
either (10)
 9:5;10:20;12:21;26:1;32:15;
 46:24;57:19;58:1;74:1,5
EKG (1)
 53:19
elaborated (1)
 54:21
elaborates (1)
 30:25
elbow (10)
 54:5;56:25;57:1,12,13;58:3;
 61:4,11;64:8,16
elected (1)
 5:20
electrical (1)
 75:24
else (10)
 15:9;23:6,10;29:4;31:1;33:9;
 56:23;80:3,5;83:16
embedded (3)
 62:1,9,11
employed (2)
 5:1,2
employment (2)
 6:7,9
enclosed (1)
 62:25
end (5)
 11:18;35:19;52:13;54:22;
 59:9
ended (1)
 56:16
ends (1)
 81:8
enforcement (3)
 26:2;28:12,13
enlarge (1)
 86:2
enlarged (3)
 39:12;40:17;86:5
enlarging (1)
 86:12
enlightens (1)
 20:15
enough (9)
 26:7;27:6;57:19;59:11;70:14,
 19;75:1;78:9;86:4
entered (2)
 7:20;8:1
entire (7)
 17:19;41:6;47:23;48:1;55:4;
 60:13;85:2
entirely (2)

71:14;85:9
entirety (2)
 34:22;50:5
entitled (1)
 52:2
envelope (1)
 87:17
epidural (2)
 47:12;48:17
epiglottis (1)
 45:21
equal (2)
 40:8,8
equals (1)
 39:5
error (1)
 56:18
Esophagus (1)
 38:1
essentially (1)
 29:10
estimate (5)
 9:23,24;10:25;12:7,24
eternal (1)
 56:8
even (9)
 9:22;10:14;32:8;65:9,14;
 67:22;70:17;71:6;74:4
eventually (1)
 58:16
evidence (15)
 29:12;30:23,25;31:15;42:6;
 48:24;49:1;50:24;51:3,7;53:20;
 60:6;61:6;65:18;76:3
exactly (3)
 32:21;37:23;77:12
exam (12)
 29:6;30:5,24;31:7;45:16,17,
 18;51:2;55:19;57:5;67:18;68:1
EXAMINATION (26)
 4:9;11:21,23;19:22;20:8;
 28:23,25;29:10;32:3,19;33:18;
 34:20,22;36:16;37:18;44:14,17;
 50:13,17;56:7;61:25;66:5,12;
 79:17;83:17;86:16
examinations (2)
 5:23;11:7
examine (6)
 8:19;28:18;29:6;31:5;61:25;
 84:25
examined (2)
 10:9,11
examiner (5)
 6:13,23,24;16:14,15
examiners (1)
 6:24
Examiner's (4)
 6:10;7:11;8:3,23
examining (1)
 10:5
examples (1)
 26:11
exams (1)

9:12
except (1)
 29:1
excessive (1)
 57:25
Exhibit (38)
 13:24;14:1,16,18,19,19,23;
 16:4;17:6,24;18:21;20:25;21:1,
 20,23,24;22:22,23;23:4;34:15,
 21,21,25;36:15;44:3,4;45:5,12;
 46:1;49:18;52:1,4,21;56:2;
 60:11;61:10,13;81:21
Exhibits (2)
 22:14,20
expense (1)
 87:2
experience (5)
 8:12;27:17;28:1;73:16;85:18
experienced (1)
 10:4
expert (3)
 11:22;12:10;83:13
explain (2)
 18:2;69:10
extend (1)
 84:13
extends (2)
 58:23;60:21
extensive (6)
 35:12;36:14;41:6;42:5;43:7;
 54:15
extent (1)
 20:12
external (32)
 28:23,25;29:5,10,13;30:22;
 40:5,15;44:14;45:16,19;50:13,
 16;51:2;56:7,10,12,19;57:2,3,5,
 6,13,23,24;58:7,14,22;65:1;
 67:18;70:17;71:3
external/cut (1)
 39:24
externally (1)
 58:11
extra (1)
 32:10
extremities (3)
 56:22,23;67:16
eye (1)
 28:16

F

face (9)
 41:5;42:6;47:24;49:5,6,20;
 56:13,25;57:9
face/neck (2)
 48:24;49:1
Facial (1)
 57:1
facility (1)
 6:25
facts (1)
 72:4

failed (1)
 83:13
fair (3)
 80:8,23,24
fall (1)
 83:8
familiar (2)
 64:21;70:23
family (2)
 4:13;79:7
far (13)
 23:8;26:18;27:12;28:4,19;
 29:7;37:2;46:5;62:4;66:8;
 68:21;69:24;74:17
fat (2)
 40:22,22
fatal (4)
 70:7;73:22;76:6,20
fatty (1)
 40:18
faxed (1)
 21:11
features (1)
 29:3
feel (3)
 27:5;63:2,2
few (8)
 6:5;10:21;26:11;34:1;36:17,
 22;38:5;86:23
Fiailoa (3)
 4:13;17:20;37:24
fibrosis (1)
 52:16
Fibrous (1)
 38:3
field (2)
 6:8;8:10
fifth (1)
 18:16
file (12)
 14:25;15:2,4,7,15;17:18,19;
 19:12,20;65:15;81:25
filed (1)
 4:12
files (2)
 15:24;33:13
fill (2)
 37:1,4
final (2)
 52:7,15
finalizes (1)
 5:18
find (12)
 10:13;15:15;33:23;34:19;
 52:18;58:14;65:10;67:23;71:6,
 8;76:3;85:14
finding (4)
 9:7;38:25;43:20;58:14
findings (30)
 5:15,16;9:6;9:6;12:5,10;18:20;
 20:16;28:21;29:2,12;30:23;
 31:6,13,15;32:9;41:25;48:21;
 51:25;52:4,11,11,16;58:10,17;

68:18;69:19,23;71:2;74:13

**finds (1)**
28:19
**finger (1)**
51:11
**finished (1)**
37:1
**finishing (1)**
19:8
**Fire (1)**
36:2
**firm (1)**
79:11
**first (24)**
4:5,11;6:14,15;15:12;16:3;
17:23;25:13,17,18;29:23;30:9;
34:24;38:2,15;43:3;50:13;54:8;
56:1,4;60:2;65:14,23;78:18
**fit (1)**
87:19
**five (4)**
7:1,5;53:11;61:1
**flat (1)**
54:2
**floor (2)**
41:12;84:25
**fluid (3)**
28:16;62:22;63:2
**focal (4)**
39:7,18;69:7;74:11
**focus (1)**
85:9
**folder (1)**
34:25
**folks (2)**
81:18;82:19
**follow (4)**
28:24;35:11;37:3;66:10
**followed (1)**
6:12
**following (11)**
4:1;6:14,20;7:2;18:19;24:15;
30:14;31:5;35:20;36:23;37:18
**follows (1)**
4:7
**food (1)**
38:2
**force (23)**
42:1,9;46:15;51:19;58:15,15;
63:5,9,10,12;66:19,25,25;68:25;
69:3;70:5;71:11;73:13,14,17,
18,21;75:14
**forces (10)**
72:9,15,17,19,20,24,25;73:5,
10,11
**Ford (1)**
4:12
**forehead (9)**
41:6;53:10,10;58:9;60:3,13,
14,22;62:17
**foreign (4)**
61:19;62:1,4,14
**forensic (10)**

6:17;7:8;8:2,6,17,22,25;9:3,
12;11:7
**forensics (1)**
8:10
**form (10)**
65:11;73:23;76:14;81:8,10,
13,24;82:2;83:19;84:1
**formal (2)**
5:13;55:25
**formaldehyde (1)**
41:18
**format (4)**
24:13,25;32:5,6
**formats (1)**
32:13
**found (7)**
12:6;33:21;35:1;53:22;64:19;
69:21;77:7
**foundation (9)**
46:18;51:21;63:6;66:22;73:3,
7,24;75:5;80:11
**four (4)**
7:1;9:21;53:11;61:1
**fourth (2)**
9:19;18:15
**fracture (53)**
38:10,12,13,15,16,18;41:8;
42:3,4,10,11,21,23;43:18,21,22,
23;45:22;46:6,9,10,11;48:10,13,
16;54:7,8;57:9;58:13,24;59:7,9;
65:8;66:2,3,3;69:14;70:13,14;
74:3,25;75:16;76:24,25,25;
79:21,24;80:2;85:11,12,17;
86:4,14
**fractured (1)**
74:19
**fractures (24)**
38:12,21;42:18;43:8,10;
44:12;46:13;54:17,17;59:24;
65:3,4,20,25;66:7,9;74:14;77:1;
84:18,21;85:1,3,5;86:1
**fracturing (1)**
75:15
**frame (1)**
29:25
**free (5)**
39:21;41:11;48:4,5;68:2
**freezer (1)**
31:10
**Fresno (11)**
5:2,7,19;6:2,15,17;7:7;10:14;
18:18;36:5;82:6
**front (28)**
17:19;24:18;30:2,18,19;38:8,
9,22,23;42:19,21,24;43:14,25;
45:14;48:11,13,13;49:21,23,25;
52:22;55:15,16;60:10;74:21;
85:6;86:6
**frontal (6)**
41:6;53:11;58:9;60:3,18,22,
22;71:9
**fsx (1)**
54:17

**full (3)**
4:14;36:24;52:13
**fully (1)**
88:7
**function (1)**
82:12
**further (8)**
30:25;50:23;62:15;66:8,11;
76:3;83:17;86:16
**future (1)**
6:4
**FX (1)**
38:18

## G

**gallbladder/BT (1)**
39:24
**gastrointestinal (1)**
38:1
**gather (2)**
23:19;26:13
**gathered (3)**
18:8;23:19,24
**gathering (2)**
26:7,11
**gave (4)**
39:11;51:1,3;55:4
**GB (1)**
39:24
**general (3)**
24:13;25:17;32:18
**Generally (8)**
12:11,20;15:16;20:13;32:6;
33:22;83:7;87:3
**generated (1)**
18:7
**gets (2)**
23:22;75:25
**GI (1)**
37:25
**given (6)**
11:6;15:5;16:21;17:18,24;
81:18
**giving (1)**
4:20
**gland (4)**
39:2,3;40:17,23
**goes (1)**
25:22
**good (3)**
37:21;53:13;65:15
**Gopal (1)**
24:19
**grams (1)**
39:12
**grass (1)**
64:19
**gray (3)**
23:1;45:13;61:10
**greater (3)**
38:4,5;73:12
**gross (1)**

68:6
**ground (4)**
71:22,24;72:2,6
**group (5)**
6:16,18;17:10;53:12;76:21
**guess (3)**
11:3;33:12;36:18
**guessing (1)**
11:2
**guidelines (1)**
26:8
**guys (1)**
34:11

## H

**Hadden (3)**
5:19;18:5;24:18
**hairline (4)**
49:23,25;60:18,23
**half (4)**
36:19;54:3,12,13
**hand (4)**
21:17;22:25,25;32:14
**handheld (1)**
32:8
**handles (2)**
82:13,14
**handwriting (2)**
37:21;52:22
**handwritten (1)**
32:15
**happened (1)**
75:15
**happening (2)**
56:16;81:8
**happens (2)**
26:7;71:14
**hard (3)**
49:25;63:19;85:18
**harness (2)**
65:6;79:25
**head (22)**
30:17;31:5;50:14;55:23;57:7;
58:8;64:5;67:14;68:25;70:1,5;
71:11,19,20,21;72:1,6;73:11,18;
76:12;84:4,14
**head/N (2)**
41:20;42:2
**headed (1)**
18:17
**heading (3)**
41:25;50:24;51:7
**headline (1)**
60:25
**head-on (1)**
64:3
**heard (1)**
25:18
**heart (22)**
31:2;39:11,17,17;42:14;
52:16;55:15;74:7,7,8,9,19;
75:20,20,21,23,24;76:1,8;77:7,

Case 2:12-cv-10994-PA-AGR    Document 156    Filed 01/09/14    Page 98 of 106    Page
ID #:21314

Edwards, Lupi  vs.
Ford Motor Company

Michael Chambliss, M.D.
August 27, 2013

8,9

**height (2)**
29:3;30:16

**held (2)**
17:15;87:12

**help (2)**
29:4,7

**helpful (1)**
44:1

**hematoma (16)**
41:5;42:5,7;47:12,12;48:17,
17;49:2,9,11,16,22;50:1,2;54:9;
57:9

**hemorrhage (46)**
38:7,11,20,23;41:7,9;42:17,
23,25;43:7,11,19,19,22;44:5;
45:6,14;46:5,7,10,12;47:15;
48:3,17;54:13,15,19,24;55:1,3,
5,5,10,13,13,15;60:25;62:23;
65:23;66:11;68:8;71:5;74:21,
24;79:24;86:3

**hemorrhagic (3)**
71:8;85:9;86:3

**hemorrhaging (3)**
45:10;55:21;68:2

**higher (1)**
9:22

**Highway (4)**
23:23;72:10,15;82:25

**hit (1)**
75:25

**holding (1)**
23:1

**home (1)**
26:3

**homicidal (1)**
9:8

**homicide (8)**
24:14;26:11;27:2;29:1,11;
73:15,19;82:16

**H-o-m-o-r-r-h (2)**
54:13;55:1

**Hopefully (1)**
43:6

**horizontal (5)**
38:10,12,13;43:18;54:7

**hospital (5)**
6:18;7:22;8:1;26:5;30:23

**hospitals (1)**
26:4

**hour (1)**
4:1

**houses (1)**
26:10

**hypothetical (2)**
73:3;75:6

**I**

**I-5 (1)**
27:15

**idea (1)**
55:10

**identification (6)**
14:2,20;21:2,25;34:16;81:22

**identify (3)**
60:9;85:4;86:7

**identifying (1)**
29:3

**II (1)**
42:9

**III (1)**
42:13

**I-IV (1)**
51:7

**Illinois (2)**
7:16,18

**immediate (2)**
57:20;84:6

**immediately (2)**
58:2;76:2

**impact (15)**
62:24;63:16,19,23;71:18;
74:4,5,6,9,25;75:7,18,20,23;
80:15

**impacting (1)**
64:5

**impacts (2)**
64:3;71:20

**impingement (1)**
66:14

**important (1)**
29:8

**inch (10)**
53:11,11;54:3,4,10,10,12,13;
61:1,2

**include (5)**
52:7,8,13;69:22;76:7

**included (1)**
52:14

**includes (1)**
6:10

**including (5)**
30:11,20,23;32:13;87:25

**incomplete (2)**
73:2;75:6

**incorrect (2)**
56:10,11

**increased (1)**
40:21

**indent (7)**
42:2,3,4,5,9,10,11

**independent (2)**
7:2;19:23

**independently (2)**
24:25;77:24

**indicate (4)**
43:24;45:6,9;46:6

**indicated (2)**
51:6;61:23

**indicates (10)**
38:10;39:20;40:2;41:17,20,
20,21;49:3;53:12;58:15

**indicating (13)**
27:11;38:22,25;39:7,9;41:4,9;
43:23;53:8,14,19;75:18;84:12

**indication (6)**
31:20;46:8;48:3;64:4;65:13,
15

**indicator (1)**
54:14

**individual (12)**
27:24;28:3;29:4,5;64:25;
65:1;69:24;71:16;78:8,21;
84:16;85:8

**individuals (7)**
23:18;24:3,5,8;26:2;67:21;
83:1

**individual's (7)**
29:2;44:8,10;58:16;74:3,10;
75:2

**induration (1)**
40:18

**infiltration (1)**
40:22

**informal (1)**
4:20

**information (28)**
5:18;8:20,24;15:12,18,23;
16:7;18:7;23:19,20,25;25:16;
26:6,7,12,13,16,18;28:2;30:8;
37:1,5,9;42:14;77:13,18,19;
81:12

**inherently (1)**
27:23

**initial (9)**
15:14,16;21:16;23:17;25:25;
26:5,22;51:2;52:10

**initially (2)**
26:17;30:7

**initials (2)**
41:8;42:1

**INJ (1)**
41:21

**injured (4)**
67:10,14,15,15

**injuries (60)**
28:19;30:20;31:4;37:2;41:21;
42:2,5;46:25;56:8,10,12,19;
57:1,2,4,6,8,19,22;58:1,5,7;
59:6,10,13;63:25;65:7,12;
66:19,23;67:3,17;68:25;69:3,
20,22,23;70:2,7;71:12;73:11,21,
22;74:13,14,15,18;75:25;76:20,
22,23;78:9;79:21;80:14;83:23;
84:3,4,5,10,15

**injuries-sternum (1)**
41:1

**injury (72)**
30:24,25;31:6;41:12;42:9;
46:16;48:3,4,5;49:4,20,22;
50:21,24;51:3,7;53:9;57:12,13,
14,17,23,24;58:2,4,14,18,19,21,
22;60:6,9;61:6;62:6;63:5,18,23;
64:8;65:18;66:6,15;70:5,12,18,
18,24;71:1,2,3,11,13,16,17;
72:7;75:1,12;76:6,12,13,13,18;
77:6;78:4,15,18;79:19;80:4,5,7,
16,23;84:14

**inner (3)**
54:4,5;61:10

**inscribe (1)**
53:3

**inside (6)**
41:9;47:7,7;66:17;77:9;84:24

**instance (3)**
27:8;59:5;77:19

**instead (1)**
53:1

**intact (1)**
59:2

**internal (12)**
30:24;31:7;44:16;45:17,18;
55:18,20;57:4;58:1;68:1;79:19,
21

**internally (6)**
31:1,3;44:15;59:24;65:2,3

**Interruption (2)**
11:13;36:2

**intestinal (1)**
65:7

**into (10)**
15:17;19:2;37:22;58:23,25;
60:22,23;62:3;70:6;75:19

**intraventricular (1)**
39:16

**inverted (2)**
49:24;50:21

**investigate (1)**
25:24

**investigated (3)**
11:1;16:13;24:17

**investigating (3)**
10:22;25:23;26:22

**investigation (7)**
17:1,20;20:5;22:3,17;23:7,11

**investigative (1)**
82:14

**investigator (1)**
82:11

**investigators (1)**
6:25

**involve (4)**
9:16,25;10:9;60:13

**involved (14)**
9:16,25;10:9,22;11:7,21;
12:11,22;23:15;25:9,25;27:4,
24;67:7

**involving (1)**
10:19

**isolated (2)**
59:12;76:18

**issue (2)**
81:8,24

**issues (1)**
18:9

**Item (8)**
48:22;54:7,9,11,15;55:23;
68:25;73:21

**items (13)**
5:17;14:24;19:9;28:6;31:12;
32:11;52:10,13;54:7;55:17;

Edwards, Lupi  vs.
Ford Motor Company

Michael Chambliss, M.D.
August 27, 2013

70:16;73:22;77:6
**IVS (1)**
  39:16

## J

**jaw (1)**
  54:12
**job (2)**
  6:14;82:13
**jobs (1)**
  6:3
**join (1)**
  7:7
**joined (1)**
  6:16
**Jonathan (1)**
  4:11
**judge (1)**
  85:1
**judging (1)**
  73:10
**judgment (1)**
  80:17
**junction (2)**
  38:15;43:18
**juncture (1)**
  45:23
**June (5)**
  6:2;7:6;29:16;37:10;81:16

## K

**keep (6)**
  13:2,8;17:8;31:10;55:8;86:22
**keeping (1)**
  43:25
**kept (5)**
  15:3,6,7,9,24
**kidney (4)**
  40:7,13;77:9,10
**kidneys (4)**
  40:7,8,12,14
**killed (1)**
  10:5
**kin (1)**
  26:10
**kind (3)**
  37:3;53:7;83:7
**knife (1)**
  47:25
**knowledge (7)**
  8:21;72:14,22,23,24;73:5;
  78:23

## L

**lab (2)**
  18:7;68:15
**lacerated (1)**
  74:15
**lacerations (1)**
  39:8

**lacks (9)**
  46:18;51:21;63:6;66:22;73:3,
  7,23;75:5;80:10
**lap (1)**
  65:7
**large (4)**
  39:1;40:13;60:12;74:15
**larger (2)**
  63:17;64:4
**larynx (1)**
  45:20
**larynx/epiglottus/hyoid (1)**
  38:24
**last (12)**
  16:8;19:15,17;21:8;43:17;
  47:13;48:24;51:24;55:23;83:3,
  6;85:14
**late (1)**
  29:22
**later (5)**
  31:10,20,21,22;54:21
**law (4)**
  4:21;26:1;28:12,13
**lead (2)**
  7:24;74:20
**leaflet (1)**
  40:1
**leaflets (2)**
  39:13,13
**learned (1)**
  25:13
**least (3)**
  8:22;28:17;73:16
**leave (1)**
  84:5
**led (1)**
  27:20
**ledger (1)**
  13:13
**ledgers (2)**
  13:9,9
**left (24)**
  38:5,15;39:2,5,14,19;40:8;
  44:8,9,21,24;53:15,23,25;54:4,
  5;56:25;57:7;58:3;61:11;64:21;
  79:22,23;80:5
**legs (3)**
  30:18;61:6;67:16
**less (3)**
  11:11,18;86:22
**lesser (1)**
  67:15
**letter (2)**
  74:2,11
**letters (1)**
  17:12
**level (6)**
  68:7;70:19,21;71:12,14;86:1
**LGT (1)**
  39:15
**life (1)**
  57:14
**light (1)**

39:15
**likely (3)**
  64:2;80:2;84:14
**line (11)**
  38:2;40:1;41:11,22;47:16;
  50:9;55:22;85:9,25;86:4;87:20
**linear (1)**
  54:4
**lines (1)**
  57:20
**list (2)**
  31:13;54:6
**listed (3)**
  31:21;51:25;52:2,3
**listing (1)**
  33:16
**little (6)**
  20:15;53:4;67:25;83:2;85:9;
  86:11
**liver (5)**
  31:2;38:6;39:23;47:5;67:17
**loaf (1)**
  48:1
**lobe (3)**
  38:6;40:2,3
**lobes (1)**
  71:9
**localized (1)**
  64:13
**locate (1)**
  15:15
**located (3)**
  56:24;60:18;64:7
**location (15)**
  36:3;43:20;45:22;46:8,9;
  50:2;53:8;58:13;60:23;62:24;
  63:16;64:4,15;66:9;75:16
**locations (5)**
  39:21;55:12;64:15;71:23;
  76:24
**long (5)**
  5:25;34:9;35:14;37:4;84:10
**look (21)**
  14:4;20:13;22:13;27:22,25;
  43:2;47:23;48:2,2,23;49:14;
  50:13;55:2;61:5;62:9,11;66:10,
  17;68:16;71:4;85:13
**Looking (15)**
  18:12;44:7,7,9;47:7;57:3;
  61:18;62:3;68:5,7;69:12;78:8;
  80:14;85:1;86:8
**looks (1)**
  55:3
**lost (1)**
  88:1
**lot (3)**
  63:16;67:25;82:14
**love (1)**
  87:8
**lower (16)**
  38:22,23;41:1;42:3,19,22,24;
  43:14;45:15,23;46:10;56:22;
  65:7,25;70:14;76:25

**lung (2)**
  59:1;69:16
**lungs (9)**
  31:2;39:4,4,5,8;69:7,12;
  74:11,15
**LV (1)**
  39:14
**lymph (1)**
  40:6

## M

**machine (2)**
  32:10,16
**maintain (2)**
  33:12;87:22
**maintenance (1)**
  87:15
**makes (1)**
  5:13
**making (1)**
  45:2
**manner (3)**
  5:12;28:5,22
**many (10)**
  9:12;11:10;12:2,7,17,24;30:2;
  35:24;82:12;83:2
**mark (5)**
  20:25;21:23;39:1;48:9;81:20
**marked (6)**
  14:2,20;21:2,25;34:16;81:22
**marking (1)**
  17:12
**markings (3)**
  64:21,24;65:1
**marks (5)**
  45:3,5;78:1,14,15
**material (2)**
  62:10,11
**matter (3)**
  35:21;68:11;88:8
**matters (3)**
  12:14,15;16:22
**may (37)**
  9:4;19:8;28:12,12,16,16;29:7;
  36:12;48:6;55:20;59:1,3;60:13,
  25;65:3,4,4,6,8,9;67:25;71:2,3,
  4,6,6,24;73:11;74:5,8,9;76:1;
  85:23,25;86:1,3,11
**Maybe (2)**
  34:10;75:10
**MD (1)**
  4:4
**mean (9)**
  33:13;47:4,6;48:9,11,15;
  63:18;72:18;82:10
**meaning (3)**
  27:15;81:10;85:8
**means (10)**
  38:5;39:3,22;53:13;54:16;
  62:7,21;68:6;69:11;77:24
**meant (2)**
  62:19;69:10

Case 2:12-cv-10994-PA-AGR    Document 156    Filed 01/09/14    Page 100 of 106    Page
ID #:21316
Edwards, Lupi  vs.
Ford Motor Company
Michael Chambliss, M.D.
August 27, 2013

**measurement (3)**
54:10,11;61:1
**measurements (1)**
51:1
**measuring (3)**
53:11;54:3,12
**medical (20)**
6:8,10,13,22,24,24;7:10,17,
19,19,22,25;8:2,23;16:14,15;
53:20;69:24;80:9,22
**Medicine (1)**
7:18
**medium/clean (1)**
54:1
**meeting (4)**
24:15;25:17;26:19,20
**Memorial (1)**
8:1
**mention (1)**
78:18
**mentioned (4)**
18:23;66:23;68:10;78:4
**mesentery (1)**
65:5
**MICHAEL (3)**
4:4,15;7:22
**microbiology (1)**
7:25
**microscopic (2)**
70:18,21
**middle (1)**
53:25
**middle-lower (1)**
38:18
**Midwest (1)**
6:20
**might (2)**
52:6;76:15
**mild (2)**
39:12,20
**Milwaukee (1)**
6:22
**mind (2)**
43:25;86:18
**minimum (1)**
24:20
**minus (6)**
48:12,13,15,15,16;54:16
**minutes (1)**
86:23
**misplaced (1)**
88:1
**Missed (1)**
56:9
**misunderstanding (1)**
75:10
**mitral (1)**
39:13
**MOD (1)**
39:18
**moderate (1)**
39:18
**moderately (1)**

40:17
**money (1)**
30:12
**months (2)**
31:22;83:6
**more (25)**
10:15,18;11:4,5;20:15;26:13;
28:2;35:25;49:23,24;51:2;
52:15,17,18;60:25;63:12;64:2,
12,16,16;71:12;74:12;76:19;
83:19;86:11
**Morgue (1)**
36:5
**morning (4)**
24:15;25:17;26:19,20
**most (7)**
9:19;11:16,17;13:3;16:4;
27:3;59:22
**Motor (24)**
4:12;11:15,16;23:22;25:6;
26:2,9;27:3;41:22;59:22,23;
63:24;66:24;67:1,4,10;72:20;
73:13,17;76:17;77:1;79:4;83:7,
9
**mouth (1)**
53:15
**move (1)**
86:10
**moved (1)**
86:9
**moving (2)**
55:8;65:18
**MRIs (1)**
59:18
**much (11)**
26:14;28:9;29:13;31:21;
35:20;59:3,24;64:4,13;73:17,18
**mucosa (1)**
40:16
**M-u-l-t (1)**
54:2
**multiple (10)**
7:3;13:9;27:3;32:16;33:14,
14;39:15;53:24;54:2;64:15
**MURPHY (51)**
4:10,11;11:19;13:23;14:3,16,
21;17:11,16,17;20:18,24;21:3,8,
10,13,19,22;22:1,12;34:7,9,13,
17,18;36:6;44:13;46:21;48:7,
20;51:10,23;55:9;59:15;60:1;
63:11;67:2;72:8;73:4,25;75:9;
77:17;79:14;80:10,25;83:18;
84:9;86:15;87:6,13;88:5
**muscle (2)**
44:5;77:8
**muscles (5)**
38:21,24;42:18;43:7,11
**musculoskeletal (1)**
41:1
**mustache (2)**
53:12,13
**MV (1)**
39:13

**MVC (1)**
41:22
**myocardium (1)**
39:14
**myself (4)**
10:20;23:13;24:18,20

## N

**nails (1)**
54:1
**name (4)**
4:11,14,15;17:25
**narrow (1)**
67:23
**narrowing (1)**
39:9
**NAT/good (1)**
53:13
**natural (3)**
9:5,20;53:13
**near (3)**
45:6;58:12;60:18
**necessary (1)**
66:19
**neck (32)**
30:17;31:5;38:20,24;42:2,6,7,
16;43:7,17;44:19;45:13,20;
49:4,5,7,16;50:2,14;57:7;65:10;
67:14;68:25;70:2,5,13;76:12,
22,25,25;84:4,15
**neck/abrasion (2)**
49:2,12
**neck/CH (1)**
41:20
**need (2)**
26:8;28:2
**needed (1)**
46:15
**needs (1)**
86:4
**negative (8)**
40:5;41:8,8;48:10,16,16,18;
54:16
**neuropathologist (3)**
8:18,18;9:1
**neuropathologists (1)**
8:22
**neuropathology (5)**
8:7,9,11,25;9:4
**New (1)**
39:4
**next (21)**
6:5;26:7,10,21;29:23;38:20;
39:23;40:1,4,7,21,25;41:3,11,
19,22;48:25;50:23;65:19;81:16,
20
**None (2)**
62:4;79:5
**nonhomicide (1)**
59:21
**normal (4)**
25:22,24;40:5;63:13

**northeast (2)**
7:3,6
**Northwestern (1)**
7:25
**note (7)**
31:1;32:12;55:11;69:23;
74:18;81:15;84:18
**noted (14)**
33:20;42:16;43:4;46:3;52:16;
57:4;60:2,6;61:22;67:18;68:1;
71:19,20;77:3
**notes (50)**
31:24;32:2,5,14,15;33:4,7,10,
18;34:1,2,19,22,24,25;35:12,14;
36:8,9,12,14,15,17,18,19,22,24;
37:6,13,18;40:20;43:10;45:10;
47:9,16;50:7;51:24,25;52:4,10,
10,12,16,20,25;53:3,6;54:21,24;
55:6
**notice (3)**
13:24;47:8;88:4
**noticeable (1)**
70:18
**noticed (7)**
30:24;44:17;51:3;56:13,13,
14;82:1
**November (2)**
35:4,17
**number (18)**
7:1;9:15,24;10:22,25;11:14;
12:19;17:25;27:25;28:5;29:24;
45:2;61:13,19;71:23,24;72:23;
86:13
**numbered (1)**
54:7
**numbers (1)**
72:19
**Numeral (1)**
48:22
**numerals (1)**
51:7

## O

**o0o- (2)**
4:3,8
**Objection (11)**
46:17;51:20;63:6;66:21;72:3;
73:2,7,23;75:5;77:15;84:1
**objections (1)**
80:25
**objects (3)**
61:19;62:1,4
**obstructive (1)**
67:21
**obtain (1)**
15:18
**obvious (3)**
48:3;69:13;74:23
**Obviously (1)**
54:20
**occasions (6)**
11:10;12:2,3,4;33:11;63:8

Case 2:12-cv-10994-PA-AGR    Document 156    Filed 01/09/14    Page 101 of 106    Page
ID #:21317
Edwards, Lupi  vs.
Ford Motor Company

Michael Chambliss, M.D.
August 27, 2013

**occupants (1)**
67:10
**occur (2)**
67:21;75:22
**occurred (8)**
4:1;29:18,22;71:16;75:4;
76:4;77:21;78:15
**occurring (1)**
35:13
**Off (10)**
17:14,15;30:13;35:22,25;
36:2;74:6;84:23;87:11,12
**Office (24)**
5:3;6:10;7:11;8:3,23,24;
12:12,21;14:25;18:8;19:21;
23:6,10,12,18;24:2,4,9,10;
25:22;26:15;61:20;82:8;87:22
**official (2)**
5:13,20
**officials (1)**
23:23
**often (1)**
11:17
**Once (13)**
19:6;20:13;23:19;26:11,19;
28:7;36:12;45:21;47:6;52:13;
71:7;81:8;87:20
**one (27)**
6:24;7:11;8:23;13:11,11,18;
27:20;28:17;32:20,22,24;33:1;
34:10;42:6;47:13;51:24;54:12;
55:5;64:14;69:6;73:9,16;76:18;
79:11;81:11;85:9;86:10
**one-dimensional (1)**
60:15
**ones (3)**
21:17,17;35:22
**only (25)**
8:16;11:2;23:14;26:16;33:6;
34:1;36:9;44:15,16;45:19;
58:13;62:23;69:13,21;75:18;
76:5;79:11,12;80:5,14;81:11;
82:24;84:8,17;85:15
**open (2)**
66:16;67:22
**opening (1)**
66:8
**opinion (15)**
5:22;18:4;35:13;46:14;51:18;
63:4;66:14,18;71:15,21;76:10,
15;83:19,24;85:18
**opinions (6)**
9:11;11:23;12:5,6,10;65:11
**opportunity (3)**
19:25;81:2;87:18
**opposed (1)**
47:8
**order (3)**
17:8;44:1;81:20
**ordered (2)**
26:25;28:7
**organ (6)**
33:8;36:22;37:2;38:20;41:18;

42:16
**organized (2)**
17:13;33:23
**organs (5)**
28:18;31:4;33:7,9;43:17
**original (4)**
49:1;87:25;88:3,8
**others (2)**
73:12;76:19
**otherwise (3)**
34:11;39:21;40:5
**ourselves (1)**
27:15
**out (19)**
6:14;7:6;9:5,9;15:5,16;26:3;
27:15;34:12;35:22,24;49:12;
55:6;65:24;76:17,20;82:16;
84:13;85:20
**outer (4)**
41:7;74:24;85:2,3
**outside (11)**
6:22;18:7;30:24;47:8,24;
68:5,15;72:23;75:19;78:11;
83:12
**over (30)**
9:14;16:3,4,14,18,22;19:7;
21:11;38:6,8,9,23;40:20;42:8;
44:5;45:14;46:10,11;50:14;
53:15;54:2;55:14;58:2;60:3;
62:16;63:17;69:11;74:21,24;
85:1
**overbroad (1)**
66:22
**oversight (1)**
46:5
**overview (1)**
30:5
**own (2)**
23:2;28:14

**P**

**page (43)**
17:25;18:1,3,4,10,15;34:24;
36:18,19;37:11,15,18,24;38:3;
40:19,21;42:16;43:6;47:9;48:8;
49:1;50:13,17,23;51:6;52:1,20,
21;53:16,22,25;54:23,25;56:1,
5;60:3,7;61:2,5;65:19,19;68:9,
24
**pages (10)**
17:23;18:13,15,16,21;36:23,
24;37:6,17;42:14
**pale (1)**
39:15
**P-a-l-e (1)**
39:15
**pancreas (1)**
40:21
**paper (4)**
15:7;34:2;36:1;53:3
**paperclipped (1)**
17:7

**papers (2)**
30:12;53:24
**paperwork (1)**
15:14
**paragraph (2)**
50:16,17
**parentheses (1)**
49:9
**part (11)**
15:3,6,7;41:2;46:5;48:24;
56:18;68:16;79:10;81:24,25
**partially (1)**
40:2
**participated (2)**
23:6,11
**particular (29)**
6:25;8:19;9:6;12:4;13:11;
15:6;23:21;24:16,24;26:12;
27:14,20;29:21,24;31:4,9,11;
33:20;35:11;37:10,12;56:17,21;
59:19;63:3;67:12;69:23;76:15;
84:3
**particularly (1)**
28:15
**partner (1)**
10:20
**pass (2)**
17:6;27:4
**passed (1)**
83:20
**passengers (2)**
67:11,12
**past (1)**
83:5
**pathologic (3)**
52:8,10,14
**Pathological (9)**
52:3;68:23;69:17,19,22;70:4;
73:20;77:3,5
**pathologist (6)**
5:9;6:1;7:4,7;16:15;82:1
**Pathology (20)**
6:16,17,18;7:9,20,21,23,23;
8:2,4,5,6,6,13;28:19;52:9,17;
69:21;77:6,7
**pathology-wise (1)**
69:25
**Patrol (2)**
23:24;82:25
**pattern (8)**
49:3,20,22,24;50:21;51:19;
54:11;57:9
**patterned (2)**
50:14;51:5
**pedestrians (1)**
67:11
**pelvic (3)**
40:12;80:4,4
**pen (2)**
44:25;60:17
**penalties (1)**
4:22
**penalty (1)**

87:21
**pending (1)**
57:20
**penis (1)**
53:9
**people (11)**
9:16;10:5;23:15;24:1,3;
25:25;26:5;27:3;28:14;66:10;
82:24
**per (1)**
32:21
**percentage (3)**
9:16,23,24
**perform (2)**
5:11;8:16
**performed (2)**
9:12;16:18
**pericardial (5)**
38:8,9;74:22,24;75:12
**perjury (1)**
87:21
**person (4)**
25:12;33:4;64:19;82:16
**personal (4)**
30:10,12;53:22,24
**person's (2)**
58:4;64:22
**perspective (1)**
28:2
**phenomenon (1)**
10:16
**phone (1)**
26:1
**photo (5)**
44:9,18;45:12,14;86:11
**Photograph (22)**
24:6;29:9;30:14,18,19;45:2,
12,18;46:1,10,11;49:18;50:18;
51:8,9;60:12,15;61:9,13;82:17;
86:2,12
**photographed (1)**
65:23
**photographic (1)**
26:16
**photographically (1)**
85:16
**photographs (48)**
15:1,3,10;20:1,3,3,7,14,17,19,
24;21:4,20,23;22:2,6,14,16,20,
22,23,24,24;23:2,3,4;24:2;
25:11;26:13;28:11;43:1,3,24;
45:9;49:14;55:14;60:9;61:8,18;
74:23;82:21,24,25;85:5,21,25;
86:6,18
**photography (1)**
28:14
**photos (3)**
44:3,18;87:4
**pictured (1)**
24:2
**piece (1)**
53:2
**place (12)**

Edwards, Lupi vs.
Ford Motor Company

Michael Chambliss, M.D.
August 27, 2013

10:17;26:5,23;27:2,12;51:15;
65:9;71:18;75:8;76:8;78:6;82:3

**plans (1)**
6:3

**please (6)**
4:13,24;7:13;44:23;51:5;56:3

**plural (1)**
39:6

**plus (3)**
18:6,7;33:25

**pm (2)**
4:2;88:11

**pocket (1)**
53:23

**point (8)**
6:5;9:8;15:6;30:20;31:14;
84:13;85:20,22

**pointing (1)**
51:11

**pole (1)**
53:18

**portion (18)**
15:4,14;19:8;31:23;53:7,16,
21,25;56:17;61:6,10;65:5,6,7;
74:5;79:25;80:1;85:2

**position (4)**
5:8,10,25;78:7

**positioned (4)**
77:14,20,25;78:10

**possibilities (1)**
9:5

**possibility (7)**
6:4;35:13;52:12;57:25;71:17;
80:8,17

**possible (8)**
31:11;34:6;42:11;57:21;
73:22;79:2,3;86:24

**possibly (2)**
33:6;79:24

**posterior (1)**
38:15

**potential (2)**
59:1;75:2

**potentially (7)**
70:7,15;74:2,10;75:21;76:6,
20

**pounds (2)**
63:21,22

**practice (1)**
8:12

**precise (3)**
70:9;83:20,21

**precisely (1)**
70:11

**predominantly (1)**
63:25

**preliminary (7)**
28:21;31:13;41:25;48:21;
51:25;52:4,11

**preparation (1)**
81:7

**prepare (1)**
31:14

**prepared (11)**
18:13,19;29:15;31:17;32:7;
34:20;35:15;56:1;81:17,18;87:4

**presence (2)**
28:12;31:6

**present (29)**
9:10,10;14:25;19:10;24:7,19,
19;25:12;26:15;28:13;30:11,12;
31:8;33:19;38:7;39:7,8;41:9;
56:23;60:3;65:14;66:16;68:20;
72:10,15;74:23;77:9,11;85:16

**presented (4)**
5:17;24:18,21;27:13

**presently (1)**
6:6

**press (2)**
63:1,2

**pressing (1)**
63:18

**pretty (8)**
10:13,16;28:9;29:13;35:20;
37:21;59:24;64:5

**previous (1)**
33:15

**primarily (3)**
6:17;8:16;35:9

**primary (2)**
8:25;62:8

**prior (9)**
6:7,9;7:6;19:12,15,20;20:19;
26:18;81:4

**priority (1)**
35:9

**private (1)**
12:13

**probability (2)**
80:9,22

**probable (1)**
38:15

**probably (8)**
9:19,22;10:15;27:18;29:11;
35:23;56:16,21

**problem (1)**
87:10

**problems (3)**
39:3;67:22,24

**procedure (3)**
28:10;53:1;87:14

**proceed (1)**
30:20

**proceeded (1)**
30:13

**proceedings (2)**
4:1;88:10

**process (5)**
28:24;30:15;34:1;53:4;78:21

**produce (7)**
19:4;57:19;73:10;79:23,24;
81:13;88:3

**produced (5)**
18:20,21;21:6,8;78:20

**product (2)**
15:14

**program (2)**
7:20;8:2

**prominent (2)**
38:17;40:17

**prompted (1)**
27:9

**proper (1)**
77:23

**prostrate (1)**
40:17

**protected (2)**
64:16,17

**protocol (3)**
25:22;28:7,9

**provide (2)**
30:5;34:4

**provided (4)**
8:20;30:7,8;34:20

**proximal (1)**
39:19

**proximity (1)**
59:12

**P-r-o-x-l-a-d (1)**
39:19

**puffy (2)**
41:4,5

**pulled (1)**
44:6

**pulling (2)**
35:22,24

**pulmonary (2)**
42:10;74:10

**purge (1)**
33:14

**purple (9)**
44:10,18,20;49:19,21;50:1,3;
60:12,16

**purpose (2)**
18:2;31:11

**purposes (3)**
87:24;88:2,7

**pursue (1)**
62:15

**put (12)**
15:16;18:6;19:9;27:7;40:9;
44:24;50:9;59:21;60:20;68:22;
77:6;86:23

**putting (1)**
36:22

### Q

**qualify (1)**
83:13

**quantify (3)**
63:22;73:13,19

**quarter (1)**
54:4

**quick (2)**
59:14;79:16

**quicker (1)**
53:5

**quickly (1)**

**4:25**

**quite (2)**
10:21;63:15

### R

**race (1)**
29:3

**range (2)**
84:6,14

**rash (5)**
64:10,14,16,19,20

**RCA (1)**
39:20

**reached (1)**
5:4

**read (8)**
13:10;37:22;42:6,16;48:22,
24;53:6;56:16

**really (3)**
62:9;64:3;85:24

**reason (2)**
35:12;87:25

**reasonable (3)**
80:9,21;88:4

**recall (4)**
24:23;25:4;30:2;35:19

**receive (2)**
23:16;87:16

**received (1)**
17:8

**recess (2)**
34:14;36:4

**recollection (4)**
19:21,23;20:7,11

**recommencing (1)**
36:5

**reconstruction (1)**
17:4

**record (9)**
4:14;17:14,15;34:17;37:22;
46:12;51:13;87:11,12

**recorded (2)**
46:12;65:24

**reddish (1)**
61:11

**redundancy (1)**
39:12

**refer (7)**
18:13;29:14;37:17;50:12;
55:14,15;76:22

**referred (3)**
20:4;61:5;64:10

**referring (19)**
17:24;23:8;24:5;33:24;37:15;
44:24;45:24;49:15,15;50:6,10;
51:15;55:11;56:15,19,22;67:11;
72:11;76:23

**refers (1)**
77:7

**reflect (1)**
36:13

**reflected (2)**

Edwards, Lupi  vs.
Ford Motor Company

Michael Chambliss, M.D.
August 27, 2013

41:7;54:15
**refresh (2)**
  20:7,10
**regard (1)**
  46:25
**regarding (11)**
  11:21,23;46:14;66:18;72:14;
  76:11,15;77:18,20;83:19;87:15
**regardless (1)**
  67:6
**region (8)**
  31:5;40:12;41:6;57:11;58:25;
  67:14,14,15
**regions (2)**
  67:9,13
**Reis (1)**
  7:22
**related (2)**
  75:13;77:4
**relation (1)**
  74:19
**relieve (1)**
  87:13
**rely (1)**
  5:22
**remember (3)**
  32:11;77:24;83:10
**removal (4)**
  24:8;78:16,21;82:19
**removed (3)**
  45:13,22;78:23
**removing (3)**
  84:22,23,24
**render (1)**
  12:10
**rendered (1)**
  18:4
**repair (1)**
  53:14
**Rephrase (1)**
  47:3
**report (46)**
  18:6,6,18,18,24;19:20;20:10,
  13,16,22;26:18;29:14;31:14,18;
  33:16;35:3,7,20;36:8;43:4,6;
  46:4;50:12,24;51:6;52:1,7,9,14,
  15,18;55:25;56:1,5,17;60:2;
  61:12;62:19;65:19;68:9,16,19,
  24;69:17;81:17,25
**Reporter (2)**
  4:6;87:14
**represent (3)**
  4:12;22:16;34:22
**representing (1)**
  79:10
**represents (1)**
  38:9
**request (2)**
  15:5,21
**requested (2)**
  35:10;79:11
**requests (2)**
  14:5;35:11

**required (1)**
  63:10
**residual (1)**
  38:2
**respect (1)**
  47:2
**respectively (1)**
  44:7
**respiratory (3)**
  67:19,22,24
**respond (2)**
  24:14;26:9
**responded (1)**
  23:20
**response (2)**
  14:18;15:21
**responsibilities (2)**
  5:10,11
**result (10)**
  12:6;38:11;58:1,2,16;67:24;
  69:12;74:2;75:2;84:15
**resulted (1)**
  69:14
**resulting (3)**
  36:3;69:15;74:17
**results (1)**
  68:13
**retain (1)**
  33:10
**retained (1)**
  33:17
**retiring (1)**
  6:5
**return (3)**
  16:2;19:4;26:15
**returned (1)**
  6:20
**returning (1)**
  23:25
**returns (1)**
  23:25
**review (5)**
  8:18;19:25;81:2,5;87:18
**reviewed (6)**
  19:12,15,18;20:19,22;21:4
**reviewing (5)**
  18:5;9:19;20:20:17;56:17
**rhythm (1)**
  74:8
**rib (4)**
  38:15;69:13,13;74:13
**rib/brown (1)**
  39:23
**ribs (2)**
  54:8;69:15
**right (58)**
  34:3;35:15;36:10,11,14,25;
  37:14;38:5,6,16;39:5,20;40:1,2,
  3,8,12;41:2;42:7,8;43:20;44:8,
  10,19,20,21,24;46:8;49:2,2,4,6,
  9,11,11,12,16,16,19,20,23,25;
  50:14;52:21;53:19;54:1,10,12;
  55:2;58:9,12;59:7;60:13,18;

66:1;70:3;74:22;75:19
**right-hand (2)**
  37:11;53:21
**road (5)**
  64:10,14,16,19,20
**role (1)**
  23:16
**rollover (12)**
  10:10,13,15,21;64:1,2,7;
  72:10,15,21;73:6;84:16
**rollovers (1)**
  10:19
**Roman (2)**
  48:22;51:7
**rotational (4)**
  72:9,14,20;73:5
**rupture (1)**
  74:8

## S

**sac (5)**
  38:8,9;74:22,24;75:12
**SAH (2)**
  47:14,15
**same (15)**
  4:20,21;20:14,16,22;28:9,10;
  29:1,13;30:19;43:14;46:8;50:1;
  54:25;80:25
**samples (1)**
  31:9
**Sarah (12)**
  22:9,10,22;23:13,16,17;30:8;
  81:11,16;82:6,16,21
**sat (1)**
  37:12
**satisfaction (2)**
  85:23,23
**Saupo (1)**
  37:24
**saved (2)**
  41:18;86:19
**saw (5)**
  45:6;47:1;64:9;78:1;86:9
**saying (3)**
  42:23;75:14;84:13
**scalp (13)**
  41:6,7;42:5;53:11;55:19;
  58:9;60:4,19,22,23;63:14;71:4;
  80:15
**scalp/outside (1)**
  54:16
**scans (1)**
  59:20
**scar (4)**
  54:3,4;77:11,12
**scars (1)**
  54:2
**scene (17)**
  21:17;22:7;23:21,22;24:10,
  12,14;25:2,4,6,7;26:9,14;27:12;
  82:17,21,23
**school (4)**

7:17,18,19,20
**sclerosis (4)**
  39:8,10;67:18,20
**scrape (3)**
  58:3;61:12;63:19
**scraped (1)**
  62:5
**scraping (1)**
  64:12
**SDH (2)**
  47:12;48:11
**SDH/EDH/ADH (2)**
  48:9,14
**SDH/EDH/SAH (2)**
  41:9;47:10
**seat (13)**
  64:22;65:6,7,9,12,17;78:2,5,6,
  12,13;79:20;80:1
**second (10)**
  16:3;18:1,2,4;47:9;54:8;56:3;
  60:7;69:6;73:21
**secondary (2)**
  40:13;78:19
**seconds (6)**
  84:4,5,6,8,14,17
**section (6)**
  42:17;47:10;52:2;60:7;65:18;
  69:17
**sections (4)**
  41:18;47:25;48:1,5
**seeing (3)**
  62:15;65:13
**self-addressed (1)**
  87:17
**send (3)**
  21:10;87:6,21
**sense (1)**
  68:20
**sent (1)**
  87:23
**sentence (1)**
  43:17
**separate (8)**
  9:9;17:9;40:3;41:14,17;
  59:11;76:17,20
**separating (1)**
  9:5
**September (1)**
  55:3
**septum/posterior (1)**
  39:16
**sequence (1)**
  71:22
**service (4)**
  19:4,18;24:9;31:23
**set (2)**
  20:24;21:22
**sets (1)**
  36:17
**setting (1)**
  4:20
**setup (1)**
  19:3

Edwards, Lupi  vs.
Ford Motor Company

Michael Chambliss, M.D.
August 27, 2013

**seventh (1)**
18:16
**severe (1)**
70:14
**sheets (1)**
48:23
**shins (1)**
54:2
**shirt (1)**
53:18
**shirts (1)**
24:7
**short (2)**
34:7;53:18
**Shorthand (1)**
4:6
**shoulder (17)**
38:21;42:20;44:6,9,10;49:19;
54:10;56:13,24;57:1;58:12;
61:6;65:5;79:23,25;80:3,6
**shoulders (5)**
43:8,12;44:11;55:16;57:10
**show (7)**
20:24;21:13,22;43:7;85:16,
19;86:4
**shows (2)**
44:4;70:17
**sic (1)**
56:8
**side (17)**
33:8;38:16;39:2;40:19;41:2;
44:19,21,21;48:2;49:4,6,20;
50:14;59:7;60:13;64:3;74:6
**sign (9)**
19:6;35:25;48:12,13,15,16,
16;84:2;87:20
**signature (1)**
19:11
**signed (5)**
35:22;82:2;84:3;88:7,8
**significance (1)**
59:3
**significant (26)**
10:12,14;27:6;28:4;29:7;
40:6;56:7,10,12,20;57:2,6,16,
19,23,24;58:6,15,19,22;68:18;
69:18;71:3;72:25;75:1;76:19
**signs (3)**
5:18;54:16;68:7
**simple (1)**
80:19
**single (1)**
40:9
**sit (3)**
26:19;36:25;76:10
**sitting (1)**
37:9
**situation (4)**
9:8;12:21;27:14,14
**six (2)**
54:6;83:6
**sixth (1)**
18:16

**size (1)**
40:11
**skin (7)**
44:6;62:5,6,7,8,14;75:18
**skull (16)**
41:7,10,13;54:16,17;55:19;
71:4;80:15;84:18,20,23,23,24,
25;85:2,3
**sleep (1)**
67:22
**sleeve (1)**
53:18
**slice (1)**
48:2
**slightly (2)**
40:4;74:6
**slip (1)**
83:8
**small (4)**
38:1;40:9,9;71:8
**smaller (1)**
6:23
**smallest (1)**
12:19
**soft (12)**
38:8,9,11;40:4;41:4;44:5,6;
62:24;64:6;75:1,17;84:22
**solidly (1)**
64:5
**someone (7)**
11:7,21;12:22;32:18;75:25;
77:24;84:11
**sometime (1)**
31:19
**sometimes (8)**
32:16;36:11;46:6;71:7,10,10;
76:2;85:18
**somewhat (2)**
63:1;64:17
**somewhere (3)**
13:14;55:22;86:21
**soon (1)**
81:9
**Sorry (3)**
49:12;54:23;55:8
**Southern (1)**
7:17
**space (1)**
33:12
**speak (1)**
24:11
**speaking (1)**
24:23
**special (1)**
80:13
**specializing (1)**
8:11
**specific (8)**
8:22;54:14;70:9;72:19,23,24;
76:11;78:9
**specifically (18)**
6:21;8:11;13:19,21;30:4;
31:20;43:12,21;64:7;65:17;

67:1;72:6;76:22;77:22;85:7,10,
17;86:4
**specification (1)**
54:20
**specifics (1)**
29:8
**specify (1)**
43:19
**specimens (2)**
28:15,17
**speculation (6)**
46:17;51:20;63:7;66:21;72:3;
80:10
**speed (2)**
72:10,15
**spell (1)**
55:6
**spelled (1)**
4:16
**spelling (1)**
55:4
**spent (1)**
83:2
**spinal (5)**
66:6,9,15,15,17
**spine (21)**
38:18,22,24;41:2;42:3,4,12,
19,22,24;43:14;45:11,15,23,23;
55:16;65:20,25;70:15;76:24;
86:10
**spines (1)**
85:5
**spleen (4)**
31:3;40:4;47:5;67:17
**spoke (1)**
25:2
**spoken (1)**
23:23
**sports (1)**
75:25
**spot (2)**
64:16,18
**spots (2)**
56:14;71:25
**ST (2)**
38:7,8
**stains (1)**
80:13
**stand (1)**
47:10
**start (2)**
17:23;66:1
**started (2)**
20:1;52:20
**Starting (1)**
37:24
**state (4)**
4:14;80:9,19,21
**stated (4)**
43:9,13,16,17
**states (3)**
13:21;16:13;35:3
**stayed (1)**

6:19
**stays (1)**
59:2
**stem (1)**
71:10
**step (1)**
26:21
**steps (1)**
26:22
**sternal (1)**
80:2
**sternum (15)**
38:10,12;42:10;54:8;65:4;
69:14;74:3,4,14,19,25;75:15,15,
16;85:12
**still (2)**
82:6,8
**stipulate (2)**
87:13;88:6
**stock (1)**
41:17
**stomach (1)**
38:2
**stone (1)**
40:13
**stones (2)**
39:25;77:9
**stopped (1)**
27:13
**straw (5)**
61:22,24;62:13,13,13
**straws (1)**
53:15
**strike (2)**
25:8;74:7
**striking (1)**
74:7
**striped (2)**
53:17,18
**structures (3)**
39:1;45:13,20
**Subarachnoid (2)**
47:15;48:17
**Subdural (2)**
47:12;48:16
**subheadings (1)**
70:6
**subpoena (1)**
14:18
**subpoenaed (1)**
21:10
**subspecialty (1)**
7:25
**suburb (1)**
6:22
**suburbs (1)**
6:11
**suffered (2)**
66:7;80:22
**sufficient (1)**
70:19
**sure (15)**
11:18;17:8,11;23:8;24:25;

Edwards, Lupi  vs.
Ford Motor Company

Michael Chambliss, M.D.
August 27, 2013

25:2;28:16;30:7;32:21;34:8;
47:2;59:15;72:11;77:12;87:1
**surface (12)**
30:18;41:11;47:7,20;62:5,6,7,
9,14;63:17,19;74:24
**surfaces (8)**
39:24;40:5,10,11,15;47:4,6;
48:4
**surgical (1)**
54:3
**surrounding (1)**
6:11
**survivable (1)**
84:7
**survival (1)**
84:4
**survive (2)**
84:11,17
**survived (1)**
83:24
**sweater (1)**
53:24
**swelling (1)**
50:3
**sworn (1)**
4:5
**system (7)**
15:17;31:2;40:25;41:1;67:19;
77:10;86:22
**systems (3)**
7:4,5;37:2

**T**

**T1 (1)**
65:21
**talk (2)**
48:8;68:23
**talked (1)**
80:20
**talking (4)**
37:7,17;47:5;49:6
**tattoos (1)**
29:4
**tear (1)**
75:20
**tears (1)**
65:5
**teeth (1)**
53:13
**telephonic (1)**
19:3
**telling (1)**
77:24
**tells (2)**
13:19;78:5
**template (1)**
37:3
**ten (1)**
36:11
**tend (2)**
64:14,17
**terms (1)**

80:19
**test (2)**
46:20;68:10
**testified (13)**
4:7;11:15,17,20;12:16,17,25;
13:1,6,13,20,20;83:4
**testify (2)**
12:13,20
**testifying (3)**
4:21;83:3,12
**testimony (4)**
4:2,20;11:6;16:21
**testing (1)**
68:21
**tests (2)**
80:20,20
**textbook (1)**
8:25
**thinking (1)**
55:18
**third (5)**
10:15;18:15;38:16;50:16;
59:8
**thoracic (8)**
38:4,14,18;42:11;45:23;
58:24,25;59:6
**though (4)**
4:19;65:9,14;70:17
**threatening (1)**
57:15
**three (6)**
31:22;54:3,10,12;76:13,20
**throughout (2)**
52:18;71:14
**thyroid (3)**
39:2,3;40:23
**times (6)**
11:20;12:7;33:15;53:1;83:2;
86:13
**tissue (11)**
38:8,9,11;41:4,17;44:6;62:24;
75:1,17;77:11,12
**tissues (5)**
40:18;44:5;64:6;75:19;84:22
**title (1)**
5:8
**today (14)**
14:11,23;15:25;16:5,10,11;
19:13,16,16;20:1,20;21:7;27:9;
76:10
**toe (1)**
54:1
**together (5)**
17:7;18:6;19:9;76:13,21
**tongue (2)**
39:2;45:20
**took (11)**
22:20,23;23:4;27:11;31:9;
36:15;41:17;71:18;75:8;82:3,21
**top (24)**
9:21;30:16;37:14,24;38:3,21;
40:21;42:18,20;43:8,12,22;
44:5,11;45:21;49:19;52:21;

53:7,21;54:10;55:16;58:12;
66:1;79:23
**topic (1)**
18:17
**torso (2)**
30:17;56:22
**total (1)**
84:15
**totally (1)**
59:12
**toward (1)**
80:1
**towards (1)**
27:22
**TOX (1)**
41:15
**toxicology (8)**
18:6,7;19:10;28:14;31:7;
41:15;68:10,13
**trachea (1)**
39:10
**tracheal (1)**
67:20
**track (4)**
13:2;37:25;38:1;39:25
**traffic (1)**
27:12
**trained (1)**
26:18
**training (13)**
6:11,12,14;7:8,10,19,20,20;
8:2,9,15;16:24;17:3
**transcribe (2)**
32:9;55:7
**transcript (3)**
87:15,16,22
**transcription (2)**
18:24;19:1
**transfer (1)**
32:11
**transport (3)**
24:1,3;78:16
**trauma (5)**
69:12,14,15;73:15,18
**treatment (2)**
30:23;53:20
**trial (3)**
87:20,25;88:4
**true (1)**
46:25
**try (6)**
4:25;11:3;28:21;35:10,12;
36:13
**trying (4)**
50:20;55:7;72:12;77:23
**turn (2)**
19:7;47:24
**two (18)**
6:19;7:22,23;8:22;17:23;
24:8;27:16;28:17;36:17,23;
37:6;39:21;40:10,11;54:3,10;
59:10;73:22
**type (29)**

7:8;9:8,9,19,21;10:16;23:21;
28:10,25;48:1;49:4;57:14;58:3;
59:12,21;60:15;63:1,18,23;
64:1,11,12,13;67:6;76:6,20;
80:2;82:16;84:16
**typed (3)**
18:25;35:20;43:5
**types (7)**
26:12;27:1,17,22;72:25;
73:10;78:9
**typing (1)**
31:22

**U**

**ulceration (1)**
62:6
**unattended (1)**
26:3
**unavailable (1)**
88:1
**unclothed (1)**
29:9
**unconscious (1)**
76:1
**Under (29)**
18:15;38:19;39:6;43:17;
49:18;50:13,16,24;51:3,6,7;
52:2,3;56:7;58:14;60:6;61:5;
63:2;68:24;69:22;70:12;74:11;
75:17;76:7;77:5;78:10;87:14,21
**undergraduate (1)**
7:16
**underline (1)**
58:13
**underlining (1)**
67:24
**underlying (1)**
58:10
**University (2)**
7:16,18
**unless (6)**
21:14;24:14;29:11;74:14;
76:18;82:15
**unsigned (1)**
87:24
**up (24)**
5:15,16;6:12;7:24;11:18;
18:25;27:14;28:20;31:12;
35:20;43:5;44:18;47:24;53:21;
56:16;59:9;60:21,23;66:8,16;
67:22;81:8;85:24,24
**updated (3)**
16:8,9,11
**upon (7)**
7:16;29:24;58:23;66:5,15;
82:1;86:9
**upper (12)**
37:11;39:10;42:4,10;46:11;
53:16;66:1,2;70:13;74:4;76:25;
77:11
**urinary (1)**
40:15

Edwards, Lupi  vs.
Ford Motor Company

Michael Chambliss, M.D.
August 27, 2013

**urine (4)**
28:17;31:8;40:16;41:16
**use (7)**
32:13,16;33:10;48:15;79:20;
80:13;88:6
**used (6)**
13:8;33:25;63:5;87:24,24;
88:1
**usually (2)**
5:22;80:3
**utilization (1)**
31:10
**utilize (1)**
27:17
**utilized (3)**
8:24;20:16;81:25

**V**

**vague (2)**
77:15;84:1
**valve (1)**
39:13
**valves (1)**
39:14
**variety (1)**
32:13
**vas (1)**
40:18
**vehicle (30)**
11:15,16;23:22;25:7,8,9;26:2,
9;27:3,23;41:22;59:22,23;
63:24;65:14;66:24;67:1,4,6,10;
72:20;73:14,17;76:17;77:1,21;
78:24;79:4;83:8,9
**vehicles (1)**
67:8
**ventricle (1)**
39:14
**ventricles (1)**
41:12
**verbal (2)**
81:18,23
**verdict (2)**
18:2,10
**version (1)**
87:24
**versus (4)**
9:6,7;73:14,17
**vertebra (4)**
38:14,16,17;59:8
**vertebra/T1 (1)**
38:14
**vertebrae (2)**
66:1,16
**vessels (2)**
63:15,17
**visible (13)**
42:25;44:14,16;45:16,19,19;
60:11,24;68:7;69:12;70:17;
71:5,7
**visit (1)**
24:11

**Visually (3)**
68:5,7;86:9
**vitae (3)**
14:13;16:5,7
**vitreous (4)**
28:15,18;31:8;41:16

**W**

**wall (1)**
39:16
**wallet (3)**
30:12,13;53:23
**Waukesha (2)**
6:21,23
**way (37)**
15:18;17:11;25:24;27:7;29:1;
32:11;46:19,20;57:5,18;58:21;
59:22;63:9,22;65:16;68:22;
70:11;71:9,25;72:5;73:16,19;
76:5,7,14,19;77:6,23,25;78:7,
10;80:15,21;83:21;84:2,7,13
**wearing (2)**
78:12,13
**week (4)**
19:17,19;21:8;81:5
**weigh (1)**
33:9
**weighing (2)**
33:7,7
**weight (6)**
29:3;30:16;33:8;39:5,12;
42:13
**weights (3)**
31:3;36:22;40:8
**weren't (1)**
66:12
**Western (1)**
7:16
**What's (13)**
5:4,8;18:12;28:7,23;37:6,10;
43:10,16;48:22;52:14;55:14;
65:14
**whatsoever (1)**
79:5
**Whereupon (7)**
14:1,19;21:1,24;34:15;81:21;
88:10
**white (3)**
24:7;39:15,15
**whole (1)**
30:17
**Wisconsin (4)**
6:21,21;7:3,6
**wit (1)**
4:2
**within (14)**
9:21;15:23,24;16:7;17:10;
36:15;56:2;62:2;80:9,21;83:5,6;
84:6;87:23
**without (1)**
54:14
**WITNESS (39)**

11:14;20:12;21:12,16;22:10;
34:8,10;44:4;45:1,25;46:19;
48:11,15;49:18;50:8,11;51:9,
14,17,22;54:25;55:4;59:17,19;
60:21;61:9,17;63:8;66:23;72:5;
73:9;75:7;77:16;80:12;81:23;
83:14;84:2;87:7,10
**word (2)**
41:4;48:25
**words (1)**
53:12
**work (5)**
6:18;24:8;32:10;82:6,8
**worked (4)**
6:17,25;8:21;23:14
**working (5)**
24:20;32:23,24;34:3;36:21
**works (1)**
32:21
**worn (1)**
78:2
**wounds (3)**
62:2,4,4
**write (6)**
26:18;33:8;35:12;36:14;
52:13;55:7
**writing (3)**
37:9;52:12;54:21
**written (8)**
26:16;34:1,2;36:12,19,24,24;
37:25
**wrong (1)**
27:23
**wrote (4)**
37:12;50:6;52:9;55:11

**X**

**x-rays (4)**
29:12;59:16,21,23

**Y**

**year (4)**
7:11,25;33:23;83:5
**years (8)**
6:5,19;7:1,2,22,23;10:3;33:14